UNITED STATES of America,
Plaintiff–Appellee,

v.

Rafer HARRISON, Defendant–
Appellant.

No. 01–2225.

United States Court of Appeals,
Tenth Circuit.

July 18, 2002.

Thomas B. Jameson, Assistant Federal Public Defender, Albuquerque, NM, for Defendant–Appellant.

Gregory J. Fouratt, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, NM, for Plaintiff–Appellee.

Before SEYMOUR, BALDOCK, and HARTZ, Circuit Judges.

HARTZ, Circuit Judge.

Once again we must consider whether a statement to a law enforcement officer by an alleged victim of child sexual abuse is admissible under the catch-all hearsay exception, Federal Rule of Evidence 807. We hold that the district court did not abuse its discretion in admitting the statement. In light of the consistency of the statement with two other admissible statements of the victim made in circumstances suggestive of trustworthiness, the professionalism of the law enforcement interrogator who elicited the statement, and the compelling detail of the statement, the district court could properly find adequate indicia of reliability, even though the alleged abuse occurred more than four years earlier and the declarant had a possible motive to lie.

A jury convicted Defendant Rafer Harrison on one count of aggravated sexual abuse of a child under 12 years old, in violation of 18 U.S.C. §§ 2241(c) and 2246(2)(A), and one count of abusive sexual contact with a child, in violation of 18 U.S.C. §§ 2244(a)(1), (c) and 2246(3). Defendant appeals, contending that the district court allowed inadmissible hearsay into evidence and that prosecutorial and judicial misconduct during the trial require reversal. We have jurisdiction under 28

U.S.C. § 1291 and Rule 4(b) of the Federal Rules of Appellate Procedure. With respect to the hearsay issue, we hold that one challenged statement was an admission excluded from the hearsay rule by Federal Rule of Evidence 801(d)(2)(B) and the other was properly admitted under Rule 807. Then we dispose summarily of the misconduct claims.

## I. *Hearsay*

### A. *Background*

Except as otherwise noted, there was no controversy in the district court regarding the content (as opposed to the truth) of the statements by the alleged victim or the circumstances surrounding their utterance.

Defendant shared a single-wide mobile home with his common law wife, Marcella Coolidge, in Shiprock, New Mexico, which is in Indian Country, *see* 18 U.S.C. § 1151 (defining "Indian Country"). Also living in the home were their son and daughter. The child victim in this case (whom we shall call C.V.) was Coolidge's daughter from a previous relationship, C.V., born in January 1986, was living with her maternal grandmother. During the night of July 8–9, 2000, Coolidge and Defendant engaged in a long and heated argument. At one point, Defendant grabbed Coolidge and threw her to the floor. After Defendant left, Coolidge barricaded Defendant from the home and informed him that he could not come in without a police officer being present.

In response to a call from Defendant, Navajo Tribal Police Officers Kathleen Yazzie and Tom Horse came to the home on the morning of July 9. Coolidge told them that she wanted Defendant to pack his clothes and get out. C.V. arrived while Defendant was packing. Moments after leaving with the officers, Defendant realized that he had forgotten his socks and asked the officers for permission to return to the home. Yazzie granted the request.

Upon re-entering the home with Defendant, Yazzie saw C.V. in the living room, crying. She was telling her mother about being sexually assaulted by Defendant. Although crying so hard that she had difficulty catching her breath, C.V. proceeded to relate three instances of past sexual abuse by Defendant.

C.V. stated that the first incident occurred in 1994 in Kirtland, New Mexico, where the family was living at the time. (This is outside federal territorial jurisdiction, so no charge arose out of this incident.) C.V. provided no specifics.

Her description of the second incident was more detailed. In 1996, after the family had moved to Shiprock, Defendant checked her out of the elementary school, where she attended the third grade. She thought at the time that her brother would also be checked out of school. Instead, Defendant drove her alone to their home, where Defendant took her into the bedroom and told her to remove her pants. Defendant then used a wet washcloth to wipe her "private area" and had intercourse with her.

C.V. said that the third assault occurred in the summer in the Shiprock home of her grandmother. As with the first assault, she gave no further details. C.V. said that she had not told anyone of the assaults because Defendant had told her not to and had threatened to kill her if she did. She said that for several years she had been living with her grandmother rather than her mother because she did not want to live with Defendant.

Yazzie testified that she did not ask C.V. any questions (although her offense report states that at one point she asked C.V. what had happened). As she told of the assaults, C.V. stood by a living room couch on which Coolidge and the two other children were sitting. During the account

Coolidge rose and stood next to C.V. Defendant first went to the bedroom, but as C.V. began speaking he came out of the bedroom and sat at the kitchen table in the same room as the others. After C.V.'s narration of events, Coolidge said that she had never known about the alleged assaults. C.V. responded that she had previously told her about them, but Coolidge continued saying that she had never known. Defendant, who showed no signs of intoxication, repeatedly stated, "I admit it," apologized, and promised that it would never happen again.

At trial there was no real dispute regarding what C.V. said. But Yazzie's version of events was challenged in other respects. C.V. and Coolidge testified that while Defendant was getting his things, he and Coolidge were yelling at each other when C.V. announced, "I'm going to do something about this." She then entered the living room and made her statement to Yazzie. Defendant, C.V., and Coolidge all testified that Defendant was highly intoxicated. Defendant said that he could recall nothing about C.V. speaking. Coolidge testified that as C.V. spoke to Yazzie, Defendant was out of earshot in another part of the home and Coolidge herself was going back and forth between Yazzie and Defendant, so all she heard C.V. say was that somebody had raped her. C.V.'s testimony was that Coolidge was present as she spoke but Defendant was going in and out of the room, getting clothes. Although Coolidge and C.V. conceded that Defendant apologized to C.V. before he left the home, they understood his apology to be for being drunk and mistreating Coolidge.

On July 14, five days after C.V.'s first statement, FBI agent Molly Amman and Navajo Indian Nation investigator Douglas Joe went to the home of C.V.'s grandmother to conduct a follow-up interview. C.V. stated that she only felt comfortable discussing this subject with the woman agent, so Joe did not participate. C.V. alleged that Defendant had sexually assaulted her on three occasions.

The first incident occurred during the summer prior to third grade. C.V. was living in Kirtland with Defendant, Coolidge, and their two children. It happened during the day while she was alone with Defendant. He told her to take her pants and underwear off. When she complied, Defendant touched her on her "private part." (C.V. indicated to Amman that her private part was between her legs, in front.) Defendant then instructed her to lie down on the bed. When she complied, he placed his "thing" (referring to his penis) inside her private part. The assault was painful and lasted a few minutes, although it seemed very long to her. Afterwards, Defendant told her never to tell anyone or he would kill her. She did not tell anyone about the assault.

The second incident occurred in the spring while she was in the third grade. Defendant, Coolidge, and their children were living in Shiprock. C.V. was living with her grandmother on the other side of town. Defendant checked her out of school in the afternoon. When she asked whether her stepbrother would also be checked out, Defendant answered that he would not, because he had already checked out of school on another occasion. Defendant was very quiet on the ride home. Once they arrived at Defendant's home, Defendant ordered her into her mother's bedroom, removed her pants and underwear, as well as his own, and again put his penis in her vagina. Comparing this incident to the first, C.V. noted that this encounter took only a few seconds and that he kissed her on the face and mouth. As

before, Defendant told her not to tell anyone. He then ordered her to get dressed and returned her to school, telling her to explain that she had gone to the dentist.

The third incident occurred the following summer at her grandmother's home. Defendant came to the home with his own two children. He directed them to wait outside and took C.V. to her bedroom. When C.V.'s stepbrother came into the house to hurry his father along, Defendant told C.V. to go into the closet. From there C.V. could hear Defendant instruct her stepbrother to wait outside. Defendant then came back to her bedroom, got her out of the closet, and put his hands down her pants. Defendant pulled her underwear up between her buttocks and told her to wear it that way all day. After he left, she straightened her clothes and stayed in her room until her grandmother returned home. He said nothing as he left.

The interview with Agent Amman lasted approximately 45 minutes. C.V. told Amman that she had recounted the same events to a police officer a few days earlier, and Defendant had admitted what he did. She said she was still afraid but wanted Defendant to leave and stop hitting her mother. C.V. was very embarrassed by the conversation but was still clear, direct, and "vehement" about her story; she made consistent eye contact while speaking and clearly articulated the details of the incidents.

From the grandmother's house, Amman and Joe went to Defendant's home. They identified themselves and told Defendant that "this was regarding [C.V.]." Defendant stated that the family had decided to rectify "this situation" themselves, that he had apologized to C.V. and promised that it would never happen again, and that there was no need for the July 9 argument to result in the family "pointing fingers at

each other." At trial Defendant asserted that the agents did not tell him that they were inquiring about allegations of sexual abuse. He claimed that his statements related to abuse of his wife.

On July 20, 2000, Amman arrested Defendant. Amman testified that when she told C.V. that Defendant was in jail, C.V. responded, "Oh, thank God."

On July 26 C.V. was examined by Dr. Caitlin Hall, a pediatrician at the Northern Navajo Medical Center. During this examination C.V. again spoke of three sexual assaults by Defendant. The first incident occurred while the family was living in Kirtland. Defendant had her remove her pants and removed his own; then he laid her on the bed and "put his thing" in her. The second incident, which occurred in Shiprock, was similar except that he removed her pants. He told her not to tell anyone and threatened her. The third incident occurred at her grandmother's home in Shiprock. It consisted of touching.

A week later Amman returned from a ten-day trip to find messages that C.V.'s family had been trying to reach her. She called C.V.'s grandmother and left a message that she was back at work. About 45 minutes later C.V. and Coolidge, her mother, arrived at Amman's office. Coolidge told Amman that C.V. said nothing had happened. C.V. did not speak. Amman asked Coolidge to leave so she could talk to C.V. alone. When Amman asked C.V. what was going on, C.V. slouched in her chair and avoided eye contact before saying that Defendant had not done anything to her. Amman told C.V. that she did not believe her, particularly since Defendant had admitted the offenses. C.V. responded, "I just want him to come home," and said she regretted having changed the family by sending Defendant away. She

told Amman that she was frightened because her mother was unemployed and Defendant could not provide financial support. She said she felt responsible.

Before trial the government filed a motion *in limine* for an order admitting C.V.'s two statements to law enforcement officers under Federal Rule of Evidence 807. The pleading stated that C.V. had recanted and might testify for the defense. It asserted the great importance of her statements to the prosecution if she continued to recant and testified on behalf of Defendant. It also noted that if she abandoned her recantation, her prior statements would be unnecessary. In addition, the motion sought admission of C.V.'s statement to Yazzie as an adoptive admission under Federal Rule of Evidence 801(d)(2)(B). Attached to the motion were reports prepared by Yazzie and Amman concerning their encounters with C.V.

Defendant responded to the government's motion and also filed his own motion *in limine* to bar C.V.'s statements from evidence. His pleadings asserted that C.V.'s statements (1) were inherently unreliable, (2) were later recanted, (3) were outright lies motivated by her desire to remove Defendant from the home, and (4) were untrustworthy because they described events that occurred "eight" years earlier and were unsupported by physical evidence of assault. Defendant also alleged that Officer Yazzie was insufficiently trained to take such statements and that Agent Amman had intended to manipulate the evidence. The district court conducted a hearing on the motions on January 17, 2001. Neither party presented testimony.

Trial began the next day. Before starting the trial, the district court ruled that C.V.'s statements to Yazzie and Amman were conditionally admissible under Federal Rule of Evidence 807. The court

stated that in light of the consistency of her three statements, the level of detail in the statements, the reaction of Defendant to the first statement, and the excited state of the declarant during the first statement, the statements demonstrated sufficient indicia of trustworthiness to be admitted. The court required, however, that the government still provide evidence at trial regarding the training and experience of the law enforcement officers, the types of questions employed, and the child's use of age-appropriate language. The court also ruled that C.V.'s statement to Dr. Hall was admissible as a statement for the purpose of medical diagnosis under Federal Rule of Evidence 803(4). In addition, the court allowed into evidence as an adoptive admission Defendant's statement in response to C.V.'s account at his home on July 9, 2000.

After the court announced these rulings, defense counsel attempted to reargue certain points. The court responded:

> I'm going to let you make your statements, but you have made the same statements that you—so far this morning that you made yesterday [at the hearing]. It's a repetition of what you said yesterday. I do not allow that in this court. You make your statements, you get the Court's ruling and then we move on. Do not interrupt the Court.

Defense counsel did not further pursue any objections to the admissibility of C.V.'s statements.

At trial Agent Amman testified to her background, training, and experience. Before becoming an FBI agent she received a law degree and practiced as a prosecutor in Iowa for about a year. She had been an agent for two and one-half years, and had been assigned to Farmington, New Mexico (which is a few miles from Shiprock) for the entire time. Her training at the FBI academy included investigative and inter-

viewing techniques. In addition, because she was the "crimes against children" coordinator for New Mexico, she had returned to the academy for special training in that area, including a full week devoted solely to techniques for interviewing children. She also attended a one-week session devoted to techniques for interviewing in general. Amman estimated that she had conducted 500 interviews during her FBI career, roughly half of which were with children.

Amman testified that the way she conducts an interview depends upon the age of the child. To illustrate this point, she explained that because a three-year-old child is very limited in language ability, the best way to conduct the interview would be to play with the child and see what the child draws or acts out. In contrast, she said, a 12–year–old child has a vocabulary of more than 5,000 words and can therefore describe past events in detail and place them in a temporal perspective. For a child 12 or older, a question-and-answer format would be proper for the interview.

Before meeting with C.V., Amman's only exposure to the case was reading the report filed by Officer Yazzie. She conducted her interview of C.V. on the front porch of her grandmother's house. Because C.V. was 14 and appeared to be alert, coherent, intelligent, and articulate, Amman decided to use a question-and-answer format for the interview. She used "open-ended" questions such as "How was your day?" as opposed to "Did you have a good day?" She testified that this type of question is preferred because it allows the interviewee to provide information with the least amount of suggestion from the interviewer. C.V. was able to answer these open-ended questions and demonstrated full fluency in the English language. Her answers showed that she had a vocabulary appropriate for her age level. During the inter-

view Amman used a soft, conversational tone of voice so that C.V. would not feel rushed or uncomfortable. At the end of the interview Amman asked "if [C.V.] had anything to add, or if there was any question that she's wondering 'why didn't you ask that?'" C.V. said no. After this testimony, the Judge stated:

> In my ruling about the admissibility of the statements made to the FBI agent and the investigating police officer, I required certain foundation. I have heard that foundation. Therefore, the statements will be admissible on the basis of my ruling this morning.

Officer Yazzie, Dr. Hall, and Agent Amman all testified at trial regarding C.V.'s statements. The government, despite having obtained immunity for C.V. for her past statements, did not call her as a witness. Testifying for the defense, she repudiated her earlier statements implicating Defendant. She did not dispute the content of the statements but contended that she had lied because she thought she could get the abusive Defendant out of the house. She said that she based her story upon what she had seen in a movie about a girl who wanted to get her father out of the home and falsely accused him of three incidents very similar to the ones she had related in her statement to Amman. Although C.V. testified that her mother had reminded her that she had watched the movie on HBO, her mother testified that she herself had not seen the movie. Defendant testified that he had never abused C.V., nor had he ever admitted abusing her.

### B. *Analysis*

On appeal Defendant challenges the admissibility of C.V.'s statements to Officer Yazzie and Agent Amman. He does not

argue that her statement to Dr. Hall was inadmissible.

### 1. *Statement to Yazzie*

We first address the challenge to C.V.'s statement to Officer Yazzie in Defendant's presence at his home. Although the record suggests that the district court admitted the statement under the catch-all exception to the hearsay rule, Federal Rule of Evidence 807, we need not rely on that exception. Under Federal Rule of Evidence 801(d)(2)(B), C.V.'s statement was not hearsay. Rule 801(d) states in pertinent part:

> A statement is not hearsay if.... :
>
> (2) **Admission by party-opponent** The statement is offered against a party and is (A) the party's own statement ... or (B) a statement of which the party has manifested an adoption or belief in its truth....

We can justify admission of C.V.'s statement on this ground because the record clearly supports admission under the rule and there is no unfairness to Defendant in our relying on the rule. *See Griffith v. State of Colorado, Div. of Youth Servs.*, 17 F.3d 1323, 1328 (10th Cir.1994).

Under Rule 801(d)(2)(B), C.V.'s statement is not hearsay if the Defendant "manifested an adoption or belief in its truth." Whether Defendant did so is a preliminary question of fact to be decided by the court, which is not bound by the rules of evidence in its fact finding. *See* Fed.R.Evid. 104(a). The Court determines the question under a preponderance-of-the-evidence standard. *See Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (addressing Rule 801(d)(2)(E), relating to co-conspirator statements).

There can be little doubt that the district court made the necessary finding. It ruled that the statement made by Defendant after hearing C.V.'s account was admissible as an admission. In context the ruling could mean only that the court found that Defendant had admitted the truth of what C.V. had said. Indeed, in finding that C.V.'s statement met the trustworthiness test of Rule 807, the district court said, only three sentences before admitting Defendant's statement as an admission, "During the time the child was making the ... first statement, the Defendant looked at her and said words to the effect, 'I told you I was sorry and it wouldn't happen again.' "

Moreover, the court's finding did not come without notice to Defendant. The parties had vigorously debated whether Defendant had indeed adopted C.V.'s account. In arguing the circumstantial guarantees of C.V.'s statement to Yazzie, the prosecution's motion *in limine* said, "Most important, however, C.V. made the statements to Officer Yazzie *in front of* the defendant and he *admitted* that she was telling the truth." Defendant's response to the motion strenuously denied the factual basis for this assertion, stating that Defendant was highly intoxicated and emotionally exhausted at the time, that he did not know what C.V. was saying to Yazzie, and that any statement he made was not in response to allegations of sexual abuse. Also, the government's motion *in limine* sought admission of C.V.'s statement to Yazzie on the alternative ground of Rule 801(d)(2)(B), and the prosecutor repeated the request at the hearing on the motion.

Because (1) the district court made the necessary factual finding for admissibility under Rule 801(d)(2)(B) of C.V.'s statement to Yazzie, (2) there is ample evidentiary support for the findings, and (3) it is not unfair to Defendant to rely on those findings, we affirm the admission of

C.V.'s statement to Yazzie under Rule 801(d)(2)(B).

### 2. *Statement to Amman*

We now turn to the admissibility of C.V.'s statement to Agent Amman. Preliminarily, we address two components of our standard of review. First, we decide whether we review for plain error or for abuse of discretion. Then, after deciding that we review for abuse of discretion, we discuss the scope of the record that we consider in determining whether there was an abuse of discretion.

■ The government contends that Defendant did not preserve his objection to admission of C.V.'s statement to Amman, and that we should review only for plain error. It relies on the proposition that to preserve an objection made in response to a motion *in limine* to admit evidence, the party must renew the objection when the evidence is introduced at trial. *See United States v. Nichols*, 169 F.3d 1255, 1264 (10th Cir.1999). We have recognized an exception to the general rule, however, "when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge." *United States v. Mejia–Alarcon*, 995 F.2d 982, 986 (10th Cir.1993). Our approach has been confirmed by the 2000 amendment to Rule 103, which states that a party need not renew an objection "[o]nce the Court makes a definitive ruling." Fed.R.Evid. 103(a); *see id.* advisory committee's note to 2000 amendment. That exception applies, at least in large part, here. Although the district court's ruling was conditional, rather than definitive, because it still required the prosecution to establish the credentials and methods of Agent Amman, the court made clear to defense counsel that it did not wish to hear repetitive argument on the matter. In *Mejia–Alarcon* we stated that "requiring the renewal of objections after a definitive ruling may be a needless provocation to the trial judge." *Mejia–Alarcon*, 995 F.2d at 986. The observation applies equally to renewing objections to those components of a court's ruling about which the court has emphatically stated it does not wish to hear further comment. Accordingly, we hold that Defendant adequately preserved his objections to the admission of C.V.'s statement, except to the extent that he might argue on appeal (which he does not) that there were shortcomings in Amman's credentials or methods, an issue he could have raised when Amman testified to those matters at trial. Thus, we will review the district court's ruling for abuse of discretion, the standard we apply when an objection has been properly preserved. *See United States v. Tome*, 61 F.3d 1446, 1449 (10th Cir.1995).

The next question is the scope of the record to be reviewed in assessing whether the district court abused its discretion in ruling on a pretrial motion *in limine*. When, as here, the party opposing the motion does not renew the objection at trial, the ruling should be affirmed if the matters presented at the hearing on the motion support the ruling. In particular, on appeal the opponent cannot rely on either new evidence at trial or any failure of the evidence at trial to conform to the movant's proffer at the hearing on the motion *in limine*. In the event of such new evidence or failure to produce evidence, the opponent has the duty to bring the matter to the attention of the district court by renewing the objection to admission of the evidence or moving to strike. *See* Fed.R.Evid. 103 advisory committee's note to 2000 amendment. ("If the relevant facts and circumstances change materially after the advance ruling has been made,

those facts cannot be relied upon on appeal unless they have been brought to the attention of the trial court by way of a renewed, and timely, objection, offer of proof, or motion to strike.") Thus, in our review of the court's ruling, (1) we need not consider evidence at trial that may suggest that the statement to Amman was untrustworthy and (2) we can consider the law enforcement reports presented to the district court at the time of its initial ruling, even if some of the observations in the reports were not repeated at trial. (Indeed, even if Defendant had renewed his objection at trial, the district court could still consider the reports in making its ruling, because the court is, in general, not bound by the rules of evidence in determining whether evidence is admissible. *See* Fed.R.Evid. 104(a).)

■ On the other hand, to affirm the district court's ruling, we may decide to consider all the evidence at trial, including evidence not presented at the hearing on the motion *in limine.* The cause of justice is unlikely to be furthered by reversing a judgment because a ruling was not supported by sufficient evidence when made but was so supported by the time of the verdict. A judge who grants a motion *in limine* to admit evidence may feel even more strongly at trial that the evidence is admissible; but absent a renewed objection to the evidence, the judge would have no occasion to make a record of the additional reasons in support of the earlier ruling. For example, in this case the district court did not make its final decision to admit C.V.'s statement to Agent Amman until both Officer Yazzie and Dr. Hall had testified, adding further detail to what was presented in the motion *in limine.* The issue is similar to that arising when a pretrial motion to suppress evidence is denied by the district court. We have repeatedly held that we will consider the

evidence at trial in support of the district court's ruling regardless of whether the motion to suppress was renewed at trial. *See, e.g., United States v. Muniz,* 1 F.3d 1018, 1021 (10th Cir.1993); *United States v. Corral,* 970 F.2d 719, 723 (10th Cir. 1992). Indeed, the grounds for considering trial evidence are stronger in this case than when reviewing the denial of a motion to suppress. Appellate court consideration of trial evidence in support of the denial of a pretrial motion to suppress has been criticized on the ground that the defendant may have no incentive at trial to challenge evidence supporting the pretrial ruling, *see* 5 Wayne R. LaFave, Search and Seizure § 11.7(d), at 417 (3d ed.1996); but here Defendant had every incentive at trial to attack the trustworthiness of C.V.'s statements. Also, it is reasonable to presume that the trial judge viewed the evidence at trial in the light most favorable to the ruling on the motion *in limine,* particularly when the opposing party could have moved for reconsideration of the prior ruling if the evidence at trial gave cause for hope for a favorable decision. *See United States v. Treto–Haro,* 287 F.3d 1000, 1002 (10th Cir.2002) (viewing evidence in light most favorable to order denying motion to suppress); *United States v. Greer,* 939 F.2d 1076, 1095 (5th Cir.1991) (viewing evidence in light most favorable to district court's admission of co-conspirator statement).

We now address the merits of the district court's ruling. We elect to review the ruling on the basis of the record at trial in addition to the record at the hearing on the motion *in limine.*

Federal Rule of Evidence 807 states:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the

statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The essence of Rule 807 is captured by our caution that the rule "should be used only in 'extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice.'" *Tome,* 61 F.3d at 1452 (quoting *United States v. Farley,* 992 F.2d 1122, 1126 (10th Cir.1993) and referring to Rule 803(24), a predecessor to Rule 807). Yet, as noted by a leading authority on the subject, "courts regularly employ the residual exception in child abuse litigation." 2 John E.B. Myers, Evidence in Child Abuse and Neglect Cases § 7.49, at 319 (3d ed.1997) [hereafter Myers].

The principal issue raised by Defendant on appeal with respect to the admissibility of C.V.'s statement to Agent Amman is that the statement did not have "circumstantial guarantees of trustworthiness" equivalent to statements covered by Rules 803 and 804. Although the issue is not an easy one, we disagree.

Of particular importance is the consistency of C.V.'s accounts of Defendant's assaults. Defendant argues that such consistency is irrelevant. He relies on the proposition that "other evidence that corroborates the truth of a hearsay statement is not a circumstantial guarantee of the declarant's trustworthiness." *Tome,* 61 F.3d at 1452. Nevertheless, consistency in the declarant's statements is not the sort of external corroboration barred from consideration. *See Idaho v. Wright,* 497 U.S. 805, 821, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Tome,* 61 F.3d at 1452–53.

In our view, the consistency of C.V.'s three statements—to Officer Yazzie, Agent Amman, and Dr. Hall—is a strong indicator of the trustworthiness of her statement to Amman. *See Doe v. United States,* 976 F.2d 1071, 1081 (7th Cir.1992) (consistency and graphic descriptions by three-year-old child strongly suggest that her statements were trustworthy); *United States v. Dunford,* 148 F.3d 385, 393 (4th Cir.1998) ("serious nature of the repeated statements made by the [teenaged] children to government officials as well as the consistency of their stories ... provide clear indicia of [their] trustworthiness"). *See generally* 2 Myers, *supra,* § 7.51, at 335–38.

And there is more here than the simple repetition of the same accusation. First, the statements to Dr. Hall and Yazzie have their own specific indicators of reliability. The statement to Dr. Hall was admitted under the hearsay exception for statements made for purposes of medical treatment. Fed.R.Evid. 803(4). As for the statement to Yazzie, although C.V. and her mother disputed Yazzie's version of events, we view the evidence in the light most favorable to the district court's ruling. *See Treto–Haro,* 287 F.3d at 1002; *Greer,* 939 F.2d at 1095. According to Yazzie, C.V. was present when Defendant was first in the home to get his belongings. C.V. said nothing at the time. But when the officers returned with Defendant a

short time later, they found C.V. sobbing and telling her mother about Defendant's assaults. This sequence of events suggests the unlikelihood that the statement was coached or the result of calculating deliberation—C.V. was silent during the officers' first appearance in the home, and she could not have anticipated their return. Moreover, she made the accusation in the presence of the accused, an inducement to veracity of sufficient impact to find constitutional protection in the context of a trial. *See Coy v. Iowa*, 487 U.S. 1012, 1019, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) ("It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' ").

In addition, the contents of her statements were sufficiently specific as to time and place and sufficiently peculiar in other respects that one would have difficulty repeating them consistently without coaching or a similar aid unless one were relying on one's memory of actual events. For this reason, Amman's testimony that she asked only open-ended questions is of particular importance.

The specificity and peculiarity of C.V.'s account to Amman are also relevant because those features in themselves can suggest trustworthiness. *See* 2 Myers, *supra*, § 7.51 at 342 ("idiosyncratic detail . . . may point toward reliability"). For example, if C.V. were fabricating the third assault, one could wonder why she included the involvement of stepbrother or why she accused Defendant only of pulling her underwear up, as opposed to forcing intercourse, as in the two previous assaults.

Defendant relies on our opinion in *Tome* in arguing that there were insufficient indicia of trustworthiness of C.V.'s statement. *Tome*, however, did not consider a factor that we find particularly persuasive here—the consistency of the declarant's statements. To be sure, the declarant in *Tome* had made multiple statements, and our opinion noted in passing that consistent repetition is a factor identified by the Supreme Court as one that should be considered in assessing reliability. 61 F.3d at 1452–53. But the opinion did not discuss the consistency of the declarant's statements in that case. We do not determine the precedential value of an opinion simply by comparing its facts to those of the case before us; a prior opinion cannot stand as precedent for a proposition of law not explored in the opinion, even when the facts stated in the opinion would support consideration of the proposition. *See Texas v. Cobb*, 532 U.S. 162, 169, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001).

Besides challenging the indicia of reliability of C.V.'s statement to Agent Amman, Defendant also suggests that certain indicia of unreliability would overcome any reason to give particular credence to the statement. Again relying on *Tome*, 61 F.3d at 1453, Defendant emphasizes the extended period of time between the alleged events and C.V.'s statements, more than three years. This factor is of great importance when considering the statements of young children, who have a very limited capacity to remember accurately over long periods of time. The declarant in *Tome* was only four years old at the time of the alleged abuse. *See id.* at 1457 (Holloway, J., concurring and dissenting). C.V., however, was sufficiently old to be able to remember the alleged events, so we defer to the district court in weighing the effect of time on her memory.

Aside from capacity to remember, the fact that the statement relates to long-past events can suggest either reliability or unreliability. A clever false accuser may allege misconduct in the distant past because of a belief that the accused would

have more difficulty establishing an alibi. On the other hand, a vindictive accuser may well think that the fresher the alleged misconduct, the graver the consequences to the accused. (One might argue that if the declarant speaks of events occurring in the distant past, the declarant had more time to concoct the story; but the argument is internally inconsistent because it is assuming that the events actually occurred.) Ordinarily, we leave it to the sound discretion of the district court to weigh whether the purported reasons for delay, or the absence of a reason, in light of the accusations made, suggest that the accusation is unreliable. Here, C.V. from the outset spoke of Defendant's threats to kill her if she reported his abuse. The district court could properly conclude that the delay resulted from Defendant's threats and did not significantly weigh against trustworthiness.

Defendant also points to the evidence of C.V.'s motive to lie. He argued in district court that C.V. accused him in order to have him removed from the home, so he could no longer abuse her mother. Again, however, it rests in the sound discretion of the district court to weigh this factor. In *Tome* we reversed the district court based in part on the evidence of an ulterior motive, *see id.* at 1454, but in that case the declarant expressed the motive even before making the accusation. The alleged victim in *Tome* mentioned the abuse to her baby sitter, Lisa Rocha, in response to a question from Rocha after she had spontaneously asked Rocha "not to let her mother send her back to her father." *Id.* at 1453. In the present case there was ample reason for the district court to discount the alleged motive to lie. For example, if one credits the account of Officer Yazzie, C.V.'s first statement was made spontaneously, after Defendant had already been removed from the household. Also, Defendant, his wife, and C.V. all readily admitted that

Defendant continually engaged in physical abuse of his wife; so if C.V. wished to have Defendant removed from the home because of that abuse, she could simply have truthfully reported the conduct.

Determining whether a statement has "circumstantial guarantees of trustworthiness" is not an easy task. There is no hard science of credibility. Psychologists can provide important insights, even data. *See generally* 1 Myers, *supra*, § 1.34 at 101–02 (noting controversy whether validity of child's accusation can be determined by analyzing the content of the statement). But in the absence of scientific results, the chief guide must be human experience. As courts grapple with the issue, the collective experience of judges who participate in the decisions—together with the experience of the commentators who critique them—gradually emerges. In the interim, however, the wisest course is to defer to the sound discretion of the trial judge, who has unequaled experience in witnessing battles over credibility.

Nevertheless, it is appropriate to express some cautions. As previously noted, Rule 807 is to be applied only in exceptional circumstances. It speaks of "circumstantial *guarantees* of trustworthiness" equivalent to those in Rule 803 or 804. A *suggestion* of trustworthiness cannot suffice. Also, just because a hearsay statement is sufficiently trustworthy does not mean that it must, or even should, be admitted. Rule 807 sets three conditions in addition to trustworthiness. For a statement to be excepted from the hearsay rule, it is necessary that

(A) the statement is offered as evidence of a material fact;

(B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can

procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Conditions B and C are of particular importance. To illustrate how "the general purposes of these rules," for example, can override guarantees of trustworthiness, consider the treatment of prior trial testimony in the Federal Rules of Evidence. Countless judicial opinions treat cross-examination under oath as the best test that a statement is trustworthy. Yet the hearsay exception for prior trial testimony requires that the declarant be unavailable to testify. *See* Fed.R.Evid. 804(b)(1). When the declarant is available to testify, the prior testimony is excludable as hearsay unless the declarant testifies at trial contrary to the prior testimony, Fed.R.Evid. 801(d)(1)(A), or the prior testimony rebuts a claim of recent fabrication, Fed.R.Evid. 801(d)(1)(B). In other words, because of the Rules' strong preference for in-person testimony, the prior testimony is admissible only if there is a special need for it.

█ Here, the district court could properly rule that C.V.'s statement to Agent Amman was the most probative available evidence with respect to the details not disclosed in her other statements. *See* 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence ¶ 807.3[3][a], at 807–21 (Joseph McLaughlin ed., 2d ed.2002) (" 'more probative' requirement cannot be interpreted with cast iron rigidity"). Moreover, the interests of justice would be served by the admission of the statement. All parties expected (accurately, as it turned out) that C.V. would testify at trial and deny the truth of the three statements. Her recantation increased the value to the prosecution of her statements at the same time that it afforded Defendant the equivalent of a devastating cross-

examination regarding her statements (what more can the cross-examiner hope for than a recantation?). We should also note that once C.V. testified, the prosecution would be able to use her prior statements to impeach her, regardless of any indicia of trustworthiness. *See United States v. Toro–Pelaez,* 107 F.3d 819, 826 (10th Cir.1997). Hence, it is not surprising that Defendant does not contend on appeal that C.V.'s statement failed to meet conditions A, B, or C of Rule 807.

In sum, although this is not an easy case, we hold that the district court did not abuse its discretion in admitting C.V.'s statement to Agent Amman under Rule 807.

## II. *Alleged Judicial and Prosecutorial Misconduct*

█ We summarily dispose of the claims of prosecutorial and judicial misconduct. The actions by the judge of which Defendant complains were no more than efforts to keep an unruly defense counsel within bounds by requiring him to approach the bench to voice the grounds for objections. In any event, the court twice instructed the jury that it should not infer from the court's actions that it had any opinion concerning the issues in the case.

As for the prosecutor's conduct, although we agree with Defendant that a prosecutor should not express a personal belief in a defendant's guilt, *see United States v. Meienberg,* 263 F.3d 1177, 1179–80 (10th Cir.2001), the prosecutor did not violate that command during his cross-examination of defense witnesses. Asking questions that probe flaws in a witness's testimony does not constitute an improper expression of opinion regarding what happened. Also, we see no substantial prejudice to Defendant from the prosecutor's sarcastic question about the probability of

a meteor hitting the courthouse (to which Defendant's objection was sustained) or from a question that elicited the perplexing information that C.V.'s father is her cousin. (The government's answer brief states that Defendant and C.V.'s father are cousins, a fact of no relevance or prejudicial impact).

■ We do have a concern with the prosecutor's closing argument. Several of his statements could be interpreted as voicing his own opinion of Defendant's guilt. We caution prosecutors to be meticulous in making clear to the jury that they are commenting only on the evidence admitted at trial. Nevertheless, the prosecutor's statements could also be viewed as comments on the evidence presented at trial, and the court instructed the jury that statements of counsel are not evidence. Because Defendant did not object at trial, we reverse only if the prosecutor's remarks rose to plain error. *See United States v. Haar*, 931 F.2d 1368, 1376 (10th Cir.1991). In our view, they did not reach that level. They would not have "affect[ed] the jury's ability to judge the evidence fairly." *Id.* at 1377 (internal quotation marks omitted). Defendant's remaining claims of prosecutorial misconduct are likewise without merit.

III. *Conclusion*

We AFFIRM Defendant's conviction.