*1075 HARTZ, Circuit Judge,
concurring in part and dissenting in part:
I join in much of the majority opinion: (1) reversal of the judgment on plaintiffs’ claims for invasion of privacy by intrusion and false light invasion of privacy; (2) rejection of defendants’ invocation of the fair-report privilege; (3) affirmance of the judgment for compensatory damages under the federal wiretap act based on plaintiffs’ unchallenged conspiracy theory (making it unnecessary, in my view, to determine whether defendants adequately preserved a claim that the agency instructions failed to inform the jury properly regarding the element of control); and (4) rejection of defendants’ First Amendment argument predicated on Bartnicki v. Vopper, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001).
I respectfully dissent, however, on two issues. First, I believe that defendants’ allegations regarding plaintiffs touched on a matter of public concern. Therefore, the jury could award damages for defamation only if it found that defendants had acted with malice. Because the jury was not instructed that it had to find malice, the defamation verdict must be reversed. Reversal of the defamation verdict would leave no state-law cause of action, so state-law punitive damages would also need to be set aside. The defamation claim could, however, be retried.
Second, I would reverse the punitive-damages award against the ADL on the federal wiretap claim. Although the ADL has not preserved its most compelling grounds for reversal of the award (the insufficiency of the evidence to support punitive damages and the improper instruction regarding what the jury must find before imposing such damages), it is still entitled to relief because of an improper instruction stating that it was presumed to know the law contained in the federal wiretap act.
I. Defamation
My ground for departure from the other members of the panel on the defamation claim is that I believe defendants’ allegations against plaintiffs touched on a matter of public concern. I do, however, agree with the majority opinion on our starting point for the public-concern analysis: “Unfortunately, Colorado law provides no clear set of guidelines for determining whether a matter is of ‘public concern.’ ” Maj. Op. at 1059. The Colorado courts have issued only a few -decisions on the subject, and none involved facts closely analogous to those presented in this case. Reasonable people can therefore differ on how to apply Colorado law here. I do not believe that the majority opinion unreasonably construes Colorado law. Nevertheless, I think it is in error.
To begin with, it is essential to keep in mind that in determining whether allegedly defamatory statements are matters of public concern, a court must assume the statements to be true. If only true statements could be matters of public concern, Colorado’s public-concern doctrine would be an empty gesture, because true statements can never be the basis for a defamation cause of action. See Churchey v. Adolph Coots Co., 759 P.2d 1336, 1341 (Colo.1988); Restatement (Second) of Torts .§ 558 (1977),
Assuming, then, the truth of defendants’ allegations, the question before us is whether it is a matter of public concern that residents of an upscale neighborhood have conspired to engage in violence and intimidation to remove a family from the neighborhood because of the family’s religious heritage. I acknowledge that the allegations do not concern the exercise of governmental power. Nor would the al *1076 leged conspiracy affect many people directly. Indeed, the allegations would be unlikely even to engender personal fear in most people; after all, Jews constitute a small minority of the population.
Nevertheless, as noted by the majority opinion, “[t]he determination of whether ... speech touches a matter of public concern rests on a particularized examination of each statement to determine whether it can be fairly considered as relating to any matter of political, social, or other concern to the community.” Maj. Op. at 1059-1060 (quoting Barrett v. Univ. of Colo. Health Sci Ctr., 851 P.2d 258, 263 (Colo.Ct.App. 1993)) (emphasis added). Thus, a purely social concern can be a matter of public concern. I would have thought that the social concern of our day is bigotry. Surely, faith-based intolerance, particularly when combined with threats of violence, is a matter of concern to the community at large. Our recognition of Martin Luther King’s birthday as a national holiday is intended to underscore this country’s commitment to end bigotry, private as well as official. Accounts of private acts of bigotry, from the schools to the office to baseball fields, can regularly be found in the media. After the tragedy of September 11, incidents of private violence against Muslims garnered front page headlines and prompted a speech by the President. In this case itself, the Denver Post and Rocky Mountain News each published a story about the complaint filed against plaintiffs before defendants conducted a press conference.
Interestingly, plaintiffs apparently accept the characterization of faith-based bigotry as a matter of public concern. In their Answer Brief they write:
Surely, ADL contends, a plaintiffs conspiratorial plan to harm persons of a particular religious faith and drive them from the neighborhood, all as furthered by the performance of criminal acts, is a matter of public concern.
The Quigleys do not disagree with that proposition in the abstract. The problem for ADL’s position is that none of this was true.
Ans. Br. at 30. Because I disagree with the suggestion that application of Colorado’s public-concern doctrine depends on the truthfulness of the allegedly defamatory statements, I think plaintiffs have conceded the real issue before the court.
In any event, regardless of whether plaintiffs have conceded the issue, I believe that Colorado law required plaintiffs to prove that defendants’ defamatory statements were uttered with malice — that is, with knowledge or reckless disregard of the statements’ falsity. Because the jury was not so instructed, judgment on the defamation claim, for both compensatory and punitive damages, must be set aside and the matter remanded for further proceedings.
II. Punitive Damages[1]
The federal wiretap act authorizes awards of punitive damages. It does not, *1077 however, describe the circumstances in which such awards are permissible. Nevertheless, the standard for granting an award is reasonably clear.
In Kolstad v. American Dental Association, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court interpreted the Civil Rights Act of 1991, which authorized punitive damages for intentional violations of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990, when committed “with malice or with reckless indifference to the federally protected rights of an aggrieved individual.” 42 U.S.C. § 1981a(b)(l). The Court held that “[t]he terms ‘malice’ or ‘reckless indifference’ pertain to the employer’s knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.” Punitive damages were therefore available under the statute only if the violator “knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.” Id. at 537, 119 S.Ct. 2118 (internal quotation marks omitted; emphasis added).
The federal wiretap act does not include language identical to, or even comparable to, the language of the Civil Rights Act of 1991 setting forth the conditions for imposing punitive damages. All it says is that relief under the act may include “punitive damages in appropriate cases.” 18 U.S.C. § 2520(b)(2). Still, the gist of the Civil Rights Act language is implicitly incorporated. First, the “with malice or with reckless indifference” language is a typical formulation of the scienter requirement for punitive damages. There are a number of other formulations, but their meanings are essentially the same. See Smith v. Wade, 461 U.S. 30, 46-48, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Second, the requirement that the wrongful scienter be directed at “the federally protected rights of an aggrieved individual” is a natural consequence of the remedy’s being afforded under a federal statute. The purpose of authorizing punitive damages under the federal wiretap act is to protect the rights created by that act. It would be rather remarkable if Congress intended the punitive-damages provision of the act to authorize punitive damages for, say, malicious violation of some state-law right not otherwise protected by the act.
Thus, it is safe to say that punitive damages under the federal wiretap act are to be awarded only for violations of the act committed “with malice or reckless indifference to the federally protected rights of an aggrieved individual.” As support for this proposition, I note that several of our sister circuits have interpreted the Fair Housing Act, 42 U.S.C. § 3613(c)(1), which, like the federal wiretap act, authorizes punitive damages without describing when they can be awarded, as requiring that the defendants “acted with malice or reckless indifference that their actions might violate a federal statute of which they were aware.” Badami v. Flood, 214 F.3d 994, 998 (8th Cir.2000); accord Preferred Properties v. Indian River Estates, 276 F.3d 790, 799-800 (6th Cir.2002); see Alexander v. Riga, 208 F.3d 419, 430-32 (3d. Cir.2000); Tyus v. Urban Search Mgmt., 102 F.3d 256, 266 (7th Cir.1996).
Accordingly, to award punitive damages against the ADL in this ease, the jury would have to find that the ADL “knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [federal wiretap act].” Kolstad, 527 U.S. at 537, 119 S.Ct. 2118.
*1078 I do not see how the jury, if properly instructed, could have made such a finding. As- the majority opinion sets forth, the attorneys upon whom the ADL was relying researched the law in late October 1994 and determined (correctly) that interception of plaintiffs’ conversations did not violate the federal wiretap act. These attorneys even contacted two state prosecutors who confirmed this conclusion. The problem here is that the law had changed (because of an immediately effective statutory amendment) by early December, less than six weeks later, when the complaint was filed and the press conference conducted.
The majority opinion seems to suggest that the ADL should have rechecked the law in early December. Perhaps it is good practice to reeheck the law periodically (although clients may be unwilling to pay for its being done too often). Yet I doubt that it would even be negligence, much less reckless indifference, not to recheck the law every few weeks. Here, the statutory amendment would not have been readily available in a printed codification by the time of the press conference. If lawyers are supposed to discover and apply the law within a few weeks of the law’s enactment, then why don’t new rules of procedure take effect immediately upon adoption, instead of giving the bar a few months to absorb the change? Quite recently this court was called upon to decide how thoroughly a criminal defense attorney should research a statute. The client had been prosecuted with evidence obtained through a wiretap purportedly authorized by Wyoming law. Our opinion held that the attorney had not provided ineffective assistance of counsel by failing to discover that the Wyoming wiretap statute had expired under a sunset provision more than three years before the surveillance in question. The court wrote, “[W]e doubt that prevailing professional norms require a review of all session laws implicated in a prosecution.” United States v. Salazar; 323 F.3d 852, 857 (10th Cir.2003). I question whether it would have been significantly more difficult for the Wyoming defense attorney (whose client’s liberty was at stake) to find the Wyoming session law than for the ADL’s attorneys to find the just-enacted amendment to the federal wiretap act.
The majority opinion also suggests that the ADL could be found to have the scien-ter requisite for punitive damages because there is no evidence that its attorneys “researched or even considered” the legality of using the recorded conversations. Maj. Op. at 1070-1071 n. 15. But if, as the attorneys found to be true before the October 25 amendment, the wiretap statute did not cover interceptions of cordless-phone conversations, it was a natural — indeed a compelling — inference that the statute also did not prohibit the use of such interceptions. (In fact, the only “use” of unlawfully intercepted communications that is barred by the wiretap act is use by one who knows or has reason to know that the interceptions violated the act. 18 U.S.C. § 2611(l)(d).)
In any event, even if there was negligence here in not discovering the new law, I do not see how the ADL’s violation of the wiretap act could be characterized as knowing or recklessly indifferent. Cf. Trans World Airlines v. Thurston, 469 U.S. 111, 128-30, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (airline attorneys’ overlooking statutory violation in its transfer policy was not conduct in reckless disregard of the statute). The ADL may have done many other things wrong, such as not checking the accuracy of its allegations. But those misdeeds are irrelevant to the availability of punitive damages under the federal wiretap act unless the ADL knew *1079 or acted in reckless disregard of whether the act was being violated.
Having said all this, I nonetheless would not set aside the award of punitive damages on the ground of insufficient evidence. By failing to move at the close of evidence for judgment as a matter of law on the claim for punitive damages, the ADL did not properly preserve the issue below. Even if a defendant moves for a directed verdict at the close of the plaintiffs case, the defendant must renew the motion at the close of all evidence (but before the jury returns a verdict) to preserve the issue for appeal. See Dilley v. SwperValu, Inc., 296 F.3d 958, 962 (10th Cir.2002). (And I should add that I doubt that the ADL’s post-verdict motion for judgment adequately raised the specific evidentiary failure that I have been addressing.)
This is not a mere technical requirement. If such a motion has merit, and the trial judge decides to grant it, the plaintiff, having had its attention directed to the gap in its evidence, may request the opportunity to reopen the evidence to fill the gap. That opportunity is lost if the motion is raised only after the verdict is rendered. For this reason, I would be extraordinarily reluctant to review the sufficiency of the evidence under a plain-error standard. We cannot know on appeal what evidence the plaintiff might have offered at trial if it had been shown the necessity of doing so. Although this circuit on occasion has conducted plain-error review of the sufficiency of the evidence in civil cases, see, e.g., Dilley, 296 F.3d at 962-63; Curtis v. Okla. City Pub. Sch. Bd. of Educ., 147 F.3d 1200, 1220 (10th Cir.1998), I am not aware of such review ever having resulted in a reversal.
Of course, regardless of whether we can reverse the judgment on the ground of insufficiency of the evidence, the judgment may be challenged on the ground that the jury was not properly instructed. Indeed, I suspect that the jury awarded punitive damages under the federal wiretap act only because of erroneous instructions.
The jury was not instructed that it had to find that the ADL acted with knowledge or reckless disregard of whether it was violating the federal wiretap act. The punitive-damages instruction required the jury to find that the ADL’s conduct was “wanton and reckless,” “reflect[ed] utter disregard for the potential consequences ... on the safety, and rights of others,” and was “especially shocking and offensive.” Such conduct would be egregious, but not necessarily founded on a knowing or reckless disregard of the .federal wiretap act.
As noted by the majority opinion, the ADL did not object to the punitive-damages instruction. Nevertheless, in this instance the ADL’s failure to object is not fatal. Early in the conference regarding jury instructions, the following exchange occurred:
Counsel for plaintiffs: Just a procedural question. Would you prefer that we hold our objections to the Court’s instructions until after the Court has gone through—
Court: No. I’m going to assume you guys object to everything in the world, and I’ll state that for the record. I’m assuming you’re objecting to everything that I do.
Aplt.App. at 4841. Given this comment by the judge, the ADL did not need to object to an instruction in order to preserve the matter for appeal. See United States v. Harrison, 296 F.3d 994, 1002 (10th Cir. 2002) (defendant did not need to object in order to preserve issue, because court had indicated that it did not wish to hear fur *1080 ther argument on the matter). The ADL cannot be accused of sandbagging here. Not only did it not indicate approval of the punitive-damages instruction, but it also had gone so far as to proffer an instruction that good faith was a complete defense to all federal-wiretap-act claims.
Remarkably, however, on appeal the ADL has not challenged the punitive-damages instruction. Therefore, I would not reverse on this ground.
Of the two challenges to the instructions that the ADL actually made on appeal, one can be swiftly dealt with. The ADL complains of the district court’s rejection of its proffered good-faith-defense instruction. But the proffered instruction was addressed to compensatory as well as punitive damages, misstated the law, and was properly rejected.
The other challenge is to the following instruction given by the court:
[Wjhether the defendant, the Anti-Defamation League, knew that the interception of the Quigleys’ private telephone conversations or the use of those conversations was illegal is irrelevant to your consideration of liability upon the claims for violation of the Federal Wiretap Act. Defendant is presumed to know the law, including the requirements of the Federal Wiretap Act.
Aplt.App. at 5043 (emphasis added).[2] Given this quoted instruction, the ADL’s violation of the federal wiretap act was presumed to be knowing. Contrary to the implication of the majority opinion, the trial court did not tell the jury that the presumption of knowledge was rebuttable. Instead, the first quoted sentence tells the jury to disregard any evidence concerning actual knowledge of the law. No further instruction told the jury to ignore the quoted instruction when considering punitive damages. If we presume that juries follow the court’s instructions, the jury must have obeyed the quoted instruction.
Of course, the ADL did not object at trial to this instruction. But, as previously discussed with respect to the punitive-damages instruction, this failure is not fatal, given the district court’s statement that it would assume that counsel were objecting to all instructions.
The only question left, then, is whether the erroneous instruction requires reversal. I am far from certain that the instruction influenced the verdict. My review of the record suggests that the jury’s sense of outrage was based on the rush to publicize unsubstantiated accusations of despicable conduct, not the violation of the wiretap act. Nevertheless, I do not think that this error can be held to be harmless. The instruction could well have influenced the jury’s decision whether to award punitive damages, as well as the amount of the award. Accordingly, I would reverse the award of punitive damages on this ground.

. I should mention a peculiarity of the jury's punitive-damage awards. The federal-law punitive award was much higher than the state-law punitive award. My first reaction to this discrepancy was that the jury must have been particularly offended by the act that violated federal law — the interception of plaintiffs' telephone calls. But there is a more likely explanation. Under Colorado law an award of punitive damages cannot exceed the award of compensatory damages. Colo.Rev.Stat. Ann. § 13-21-102. The sum of the jury's state-law punitive awards (against both defendants, in favor of both plaintiffs) equals the sum of the compensatory awards (although the jury gave Mrs. Quigley a punitive award that exceeded her compensatory award while giving Mr. Quigley a punitive award less than his compensatory award). It seems reasonable to conclude that the jury would have *1077 awarded the same amount of punitive damages on the state-law claim as on the federal-law claim if state law had allowed a higher award.

. The district court next said, "I will now turn to the subject of damages,” and discussed in turn the three types of damages (nominal, compensatory, and punitive) at issue with respect to plaintiffs' various causes of action. Id. At the outset of the discussion of punitive damages, the court said that the matter "is complicated, because the standards are different depending on what claim you are considering.” Id. at 5045. Among the differences between state and federal punitive damage standards are the Colorado cap on such damages {see, supra, n. 1) and the Colorado requirement of proof beyond a reasonable doubt.