**STATE of Iowa, Appellee,**

v.

**Raymond Clifford METZ, Appellant.**

No. 99–1790.

Supreme Court of Iowa.

Nov. 15, 2001.

Linda Del Gallo, State Appellate Defender, and Patricia Reynolds, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger and Scott D. Brown, Assistant Attorneys General, Ron Robertson, County Attorney, and Timothy N. Schott, Assistant County Attorney, for appellee.

CARTER, Justice.

Defendant, Raymond Clifford Metz, appeals from the judgment and sentence entered following his conviction for first-degree murder. He contends the district court erred in failing to grant a mistrial due to the prosecutor's comments on his postarrest silence. The court of appeals agreed that the matter complained of warranted the granting of a new trial. After reviewing the record and considering the arguments presented, we vacate the decision of the court of appeals. The judgment of the district court is reversed, and the case is remanded to that court for a new trial.

The evidence presented at defendant's trial was substantially as follows. Defendant and his friend, Donald Rundall, the victim of the alleged crime, were drinking together on the evening of September 15, 1998. Late that evening, they went to defendant's apartment, where Rundall died from blunt-force trauma sometime before 8 a.m. the following morning. The injuries that Rundall sustained were cranial, cerebral, and cervical trauma; a broken nose, jaw, breast bone, several broken ribs; a torn liver; and a bruised lung.

At 8 a.m. on September 16, Richard Hogan, a coemployee of defendant, arrived at Metz's apartment by prior arrangement to drive Metz to work. Hogan testified that, when Metz opened the door of his apartment, he was covered with blood and stated, "I think I killed a man." Metz then stepped outside and Hogan entered the apartment. Hogan observed Rundall's body on the floor. Although the body was stiff, Hogan checked for a pulse and found none.

Hogan exited the apartment and told Metz that the man inside was dead. At that point, Metz told Hogan to do what he had to do. Metz reentered his apartment, changed his shirt, and then came back outside. He then walked away toward a nearby bar and encountered other employees, telling them "I didn't mean to do it." At the bar he consumed an undisclosed amount of alcohol and told persons gathered there that "I think I killed a man" and "I didn't mean to do it."

Responding to Hogan's call, police came to the scene, located defendant at the nearby bar, and arrested him for the murder of Rundall. The police attempted to interview defendant over a period of eight hours. Only a portion of this interview was recorded. The record is silent as to the content of any unrecorded statements Metz may have made to the police. The recorded portion of the interview is difficult to understand, and it appears that Metz was under the influence of alcohol during this questioning. Noticeably lacking in the recorded interview is any description of how Rundall's death occurred or defendant's role in it.

At trial Metz testified that he and Rundall had been drinking at Rundall's girlfriend's apartment on the evening of September 15. Toward the end of the evening, they left, walked to a convenience store and purchased beer, which they took to Metz's apartment. Defendant testified that, after he and Rundall had consumed some of the beer, he either passed out or fell asleep. He stated that early on the morning of September 16 he was awakened by a person lying on top of him. In addition to that person, he was able to see silhouettes in the semi-darkness that indicated the presence of at least two other persons.

Metz testified that he became engaged in a fight with the intruder who was lying on top of him. Metz testified that he fought with the person until the intruder stopped struggling. He then turned on the light and realized for the first time that the other person was Rundall. He gave no explanation as to what occurred with the two other persons he purported to see in the room. He stated that he passed out again and did not awake until Hogan came to his apartment at 8 a.m.

In cross-examining Metz, the prosecutor asked the following questions:

Q. I just want you to answer my question, did you tell the police what you've told us here in this court room today, did you ever tell them that? A. No.

Q. Never did? You had an opportunity to do that, didn't you? Didn't you talk to Detective Webb and Guthrie? A. I never really talked to them, no.

Q. Okay. But you were with them at the police department, for quite a long time? A. For about nine hours, wasn't it?

Q. You never told them what we've just heard here in the court room today? A. No.

Q. Never told them about the silhouettes or about Don Rundall jumping on you at the apartment, never told them that? A. I don't believe I told them

anything. As a matter of fact, I told them I didn't want to talk to them. When this questioning commenced, defendant's attorney immediately objected and asked to make a record outside of the presence of the jury because he thought that if the jury heard his objection it would prejudice his case. Outside the presence of the jury, defendant's counsel objected to the questioning on the basis it impinged on his client's right to remain silent and to avoid self-incrimination. The district court overruled that objection and also overruled defendant's subsequent motion for mistrial. During rebuttal argument, the prosecutor reminded the jury that Metz had failed to tell police officers about his version of the incident when he was questioned at the police station on September 16, 1998.

The jury returned a verdict of guilty on the charge of first-degree murder. Other facts that bear on the issues involved in this appeal will be discussed in connection with the legal arguments that have been presented.

## I. *Prosecutor's Cross–Examination of Defendant Concerning His Postarrest Silence.*

■ A. *Should this cross-examination have been permitted?* The basis for defendant's argument in the district court and in this court is that this questioning was improper because it diluted his Fifth Amendment guarantee against self-incrimination that was expressly confirmed in the *Miranda* warning he received. A similar claim was successfully advanced in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *Doyle* involved two defendants who each testified at trial that he had been framed. During cross-examination, the prosecutor inquired as to why they had not told the police their story following arrest. The Court held that the

Fifth Amendment guaranty against self-incrimination prohibits impeachment on the basis of a criminal defendant's silence after receipt of *Miranda* warnings. *Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245, 49 L.Ed.2d at 96. In commenting on the attempted use of postarrest silence in circumstances in which the accused had received *Miranda* warnings, the Court stated:

In such circumstances, it [is] fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* The court of appeals held that the challenged testimony fell within the *Doyle* proscription.

The State, on further review, urges that *Doyle* does not prohibit cross-examination designed to show that a defendant told the police a substantially different story than that which was told to the jury. It urges that such impeachment by prior inconsistent statement is authorized in the Court's post-*Doyle* decision in *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

*Anderson* involved a defendant arrested for murder after he was discovered in the victim's automobile. The defendant was given *Miranda* warnings before he told the police detective that he had stolen the car from a location about two miles from the bus station. At trial defendant testified he had stolen the car from a parking lot directly across the street from the bus station. On cross-examination, he was questioned about the inconsistency between his postarrest statements and trial testimony. Defendant sought to overturn his conviction through federal habeas corpus on the theory that this cross-examination was prohibited by *Doyle.* The Court, although reaffirming *Doyle,* held that it does not apply to cross-examination that

merely inquires into prior inconsistent statements. *Anderson,* 447 U.S. at 408, 100 S.Ct. at 2182, 65 L.Ed.2d at 226. The Court concluded "[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* In *Bass v. Nix,* 909 F.2d 297 (8th Cir.1990), the federal court attempted to reconcile the *Doyle* decision with the *Anderson* decision and concluded that the fact there is some conversation with the police does not necessarily bring a case within the *Anderson* doctrine unless the conversation pertains to the suspect's role in the offense or offers an exculpatory story or alibi. *Bass,* 909 F.2d at 301. That was not the situation in the present case.

We agree with the court of appeals that the present case is governed by the proscription laid down in *Doyle.* The challenged cross-examination cannot be viewed as mere inquiry into prior inconsistent statements. We say that for two reasons. First, any claim that the challenged cross-examination was part of an effort to impeach defendant by the use of prior inconsistent statements is completely negated by the fact that the alleged inconsistent statements were never offered in evidence for the jury to hear. As a result, the impeachment on which the State relies is a phantom impeachment that never occurred. Second, because the parties have argued this issue based on the contents of the recorded portion of defendant's interrogation, which is in the record only as an exhibit relevant to a suppression hearing, we have, like the court of appeals, listened to the tape and conclude that it is noticeably lacking in any comment by defendant on how Rundall's death occurred or defendant's role in it.

■ The State contends that the recorded interview shows that Metz asked the

investigating officers about Rundall's condition and also mentioned that he had "popped someone." A suspect does not waive his right to remain silent by asking the officers a question. *Id.* at 301. The statement that he had "popped someone" was in no way inconsistent with his trial testimony. There was simply nothing in the police interview relied on by the State that gave it any basis for impeaching defendant's trial testimony based on inconsistent statements made in that interview. The prosecutor's question in the present case was designed and so functioned to impeach Metz's trial testimony by reference to his postarrest silence and nothing else. The State did not advise the jury of any prior inconsistent statement, and in the record before us, none has been shown to exist.

■ B. *The State's claim of harmless error.* We are unable to accept the State's contention that any error from permitting an improper impeachment of defendant by commenting on his postarrest silence was harmless. The court of appeals concluded that, because the issue is being raised on direct appeal, the harmless-error standard for constitutional deprivation laid down in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), is the standard to be utilized in the present case. We agree. Although the State requests that we apply the standard applied in *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), that case establishes the less-demanding standard of prejudice to be applied in collateral attacks based on *Doyle* violations. It implicitly recognizes that the *Chapman* standard applies in direct appeals of *Doyle* violations. *Greer,* 483 U.S. at 765–66, 107 S.Ct. at 3109, 97 L.Ed.2d at 630. Moreover, the finding of harmless error in *Greer* was based on a factual situation in which the offending testimony had been

stricken by the court and the jury instructed to disregard it. *Id.*

Under the standard established in *Chapman*, error of constitutional dimension must be shown to have been harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–11. In the present case, the error, which is of constitutional dimension, allowed an improper contradiction of facts that constituted the heart and core of defendant's defense. The improper matter that the court allowed would surely have cast doubt in the jurors' minds as to defendant's claims of justification and absence of malice and intent to kill. The court of appeals was correct in concluding that the error was not harmless.

## II. *Issues That May Arise on Retrial.*

We find it necessary to consider other issues raised on appeal that may occur again on retrial.

**A.** *Refusal to give a mistake-of-fact instruction.* Defendant requested the district court to give a mistake-of-fact instruction, allowing the jury to excuse his conduct or diminish its legal effect because of his mistaken belief that the victim was someone other than Rundall. The district court refused to so instruct the jury. Under Iowa Code section 701.6, a mistake of fact is only of legal significance if it tends to negate some element of the crime charged. *Saadiq v. State*, 387 N.W.2d 315, 323 (Iowa 1986).

Apparently, it is defendant's theory that, if he had known it was Rundall who jumped upon him, he would not have attacked him. We do not believe that the hypothetical question of what defendant would have not done given certain knowledge was a matter for the jury to decide. Its job was to decide what he did do. The trial court correctly instructed the jury on the elements of first-degree murder, including the need for the State to show malice and a specific intent to kill. The court also correctly instructed the jury on the defendant's theory of justification. Under neither of these instructions was the identity of the victim of any significance. If the jury found, as it must have, that the killing was not in justification and was done with malice and a specific intent to kill, it matters not who defendant believed the victim was or was not. The district court did not err in refusing to instruct the jury on defendant's mistake-of-fact theory.

**B.** *Crime scene photographs.* Defendant contends that the district court erred in admitting into evidence gruesome photographs of the victim's body as found in Metz's apartment and as it appeared in various stages of autopsy. We have recognized that "[m]urder is often a gruesome affair giving rise to equally gruesome evidence—[t]hat alone is not sufficient reason to exclude that evidence." *State v. Brown*, 397 N.W.2d 689, 700 (Iowa 1986). The photographs in question were used to illustrate the testimony of the medical examiner and make it comprehensible to the jury. They also demonstrated the violent nature of the attack and thus constituted material evidence of the State's assertion that the killing was done with malice and a specific intent to kill. We conclude that the district court did not err in concluding that the probative value of the photographs was not outweighed by the prejudicial effect.

**C.** *Admission of hearsay evidence.* Defendant contends that the district court erred by admitting the testimony of a DCI agent concerning a conversation with a witness who, at the time of trial, was deceased. The witness in question was an employee of a pawn shop that Metz visited shortly following Hogan's discovery of the victim's

body and prior to defendant's arrest. This employee, Judy Leaym, told the DCI agent that, when Metz entered the pawn shop he stated, "I did it, I killed somebody" and "I really did it this time, I slipped."

The district court admitted the evidence over defendant's hearsay objection by relying on the residual-hearsay exception contained in Iowa Rule of Evidence 804(b)(5). In considering the proper use of the residual-hearsay exception, we have said that to fall within its provisions the proffered hearsay statement must show (1) trustworthiness, (2) materiality, (3) necessity, and (4) that it fosters the interest of justice. *State v. Weaver,* 554 N.W.2d 240, 247 (Iowa 1996); *State v. Rojas,* 524 N.W.2d 659, 662–63 (Iowa 1994). In addition, the rule requires that prior to admitting such evidence the adverse party must be given notice in advance of trial and reasonable opportunity to prepare to meet the evidence. Iowa R. Evid. 804(b)(5); *State v. Kone,* 562 N.W.2d 637, 639 (Iowa Ct.App.1997).

In the present case, the State had available to it for use at trial the testimony of other witnesses who had actually heard statements made by the defendant between the time of Hogan's discovery of the body and the time of his arrest. These utterances included statements by defendant that he had killed somebody and that he had made a big mistake. One portion of the officer's hearsay account of what Leaym purportedly heard merely duplicated the testimony of other witnesses that defendant had stated that he had killed somebody. The other portion of the hearsay statement that "I really did it this time, I slipped" does not differ substantially from the testimony of the other witnesses that defendant stated that he had made a big mistake. We find no basis for concluding that this evidence was necessary for the State's case. The residual hearsay rule should not be invoked in the absence of a far greater need than that which was shown to exist. On retrial this hearsay evidence should be excluded.

We have considered all arguments presented and conclude that the decision of the court of appeals should be vacated due to the admission of the challenged hearsay testimony, which we have deemed to be inadmissible. The judgment of the district court is reversed, and the case is remanded to that court for a new trial consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**