# IN THE SUPREME COURT OF IOWA

No. 19–1067

Submitted September 15, 2021—Filed October 22, 2021

**STATE OF IOWA,**

> Appellee,

vs.

**JAKE SKAHILL,**

> Appellant.

---

Appeal from the Iowa District Court for Dubuque County, Monica L. Zrinyi Wittig, Judge.

The defendant seeks further review of a court of appeals decision affirming his convictions for sexual abuse and other offenses against a child, challenging the admission of two forensic interviews of the child and the failure of his trial counsel to object to certain actions by the guardian ad litem. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Ashley C. Stewart (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Zachary C. Miller (argued), Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This case presents the recurring issue of when forensic interviews of child complaining witnesses should be admitted into evidence. The defendant was convicted of sexually abusing his seven-year-old daughter. At trial, the daughter testified and described the abuse. In addition, a nurse, a physician, and the girl's mother all testified concerning the girl's reports of the abuse. The defendant's appeal centers on the trial court's decision also to admit videos of two forensic interviews in which the daughter described the abuse.

We conclude on appeal that the forensic interviews were not admissible. They were not statements made for medical diagnosis or treatment, *see* Iowa R. Evid. 5.803(4), nor did they fall under the residual hearsay exception because they were not "more probative on the point for which [they were] offered than any other evidence that the proponent can obtain through reasonable efforts," *id.* r. 5.807(*a*)(3). We also conclude their admission was not harmless error based on our review of the record, particularly the manner in which the case was tried.

The defendant has raised an ineffective assistance claim relating to his trial counsel's failure to object to the role played by the child's guardian ad litem (GAL) in the prosecution of the case. Although we need not resolve the ineffective assistance claim in full, we address these issues to some extent to provide guidance for retrial.

In sum, we vacate the decision of the court of appeals, we reverse the defendant's convictions because of the erroneous admission of the forensic interviews, and we remand this case for a new trial.

**II. Facts and Procedural Background.**

The appellant, Jake Skahill, was convicted of sexual abuse in the second degree, in violation of Iowa Code section 709.3(1)(*b*) (2018), a class "B" felony; enticing a minor, in violation of section 710.10(1), a class "C" felony; and indecent exposure, in violation of section 709.9(1), a serious misdemeanor. Each of these charges stemmed from events that occurred in mid-February 2018, when Skahill was home with his seven-year-old daughter, K.W. At that time, custody of K.W. alternated between Skahill and K.W.'s mother. While this was hard on K.W., the coparenting arrangement was not mired in conflict, and K.W. generally enjoyed her time at her dad's house. Skahill was then twenty-four years old. In addition to K.W., Skahill lived with his wife and four other children—three half-siblings to K.W. and one stepsibling.

Wednesday, February 14, was the beginning of a several-day period when K.W. would be out of school because of parent–teacher conferences. She stayed with Skahill from Wednesday evening to Sunday afternoon. Skahill regularly worked a late shift as an assistant manager of a convenience store. He remained home on both Thursday and Friday morning while his spouse was working. Skahill testified at trial that he spent both mornings watching TV, picking up around the house, and keeping an eye on the kids. K.W. told a different story. K.W. testified that on one of those mornings, she sat on her dad's lap in a living

room chair while they watched TV and fell asleep on his chest. When asked what happened when she woke up, she replied, "We were under the blanket, and he showed me his private." She went on to testify that Skahill asked her to "wiggle it." K.W. also described being touched by Skahill: "He touched me . . . [o]n my privates . . . [i]n between my legs."

K.W. said the touching occurred under her clothes. She agreed that the touching could be described as a "brush up against" her privates but also answered that it was painful. K.W. testified that after these things occurred, "[Skahill] told me . . . that this was our secret." K.W. testified that she was afraid of Skahill and avoided him the rest of the long weekend, although witnesses who were around them both testified that they noticed nothing out of the ordinary.

Shortly after K.W. returned to her mother on the afternoon of Sunday, February 18, she explained to her mother that there was a secret she thought she should tell. According to K.W.'s mother, K.W. told her that Skahill had "touch[ed] her insides" and asked her to touch his penis with her hand and mouth. K.W.'s mother was "shocked" and took her to the emergency room to be examined that evening. There, K.W. told the nurse that she fell asleep on the chair and that her dad touched her when she woke up. She again stated that her dad had tried making her "touch his privates" and had told her to keep it a secret. An examination report from this visit noted K.W. had a "[s]hort linear mucosal wound inferior and to the left of the urethral opening" in the genital area. K.W. also stated that her "bottom" sometimes hurt when she sat down after her dad touched her.

On Monday, February 19, K.W. was taken to St. Luke's Child Protection Center (CPC) for a physical exam and forensic interview. Dr. Regina Butteris performed the physical exam. At the beginning of the exam, she inquired into K.W.'s history and what brought her there. K.W. told her that her dad had touched her "private area" with his hands. Dr. Butteris did not observe a wound at that time, but she testified that it was not uncommon for mucosal wounds to heal quickly. She also explained that such a wound could be caused by "falling on something that would injure a vaginal area, wiping, scratching, that sort of thing could cause an injury to the vaginal area as well." Dr. Butteris found no physical evidence to corroborate K.W.'s account of what happened, but she clarified that "[m]ost of the time, there is no physical evidence."

After Dr. Butteris performed the physical exam, Roseanne Van Cura conducted a recorded forensic interview. Van Cura began by building a rapport with K.W. and gathered some background information on her families. Early in the interview, K.W. confirmed an understanding that she had come to the CPC for a "checkup." However, later on, Van Cura asked K.W., "Tell me why you came to talk with me today." K.W. responded, "I don't know."

Van Cura asked K.W. what kind of punishment Skahill used on her, to which K.W. responded, "You get spanked or you get popped in your hand or the mouth." To explain what getting "popped" means, K.W. demonstrated by slapping her own mouth and hand. When asked if it hurt, she replied, "Yeah. I get red marks. Not on my lips though." K.W. went on to say that a pop on the hand made her bleed when she was three years old. Shortly after inquiring into

punishment, Van Cura told K.W. that she had two rules: (1) K.W. could say anything without getting into trouble, and (2) it was important to tell the truth.

At this point, the interview turned to the sexual abuse. K.W. reported that Skahill had told her to wiggle his privates and made her touch his privates while she was on his lap in the living room chair. Substantively, K.W.'s account of the abuse was consistent with her later trial testimony. The interview questions, however, were more open-ended and slower paced, and as a whole, the interview provided more context than the later, shorter trial testimony.

On March 23, Skahill was charged in the Dubuque County District Court with four offenses: second-degree sexual abuse, lascivious acts with a child, enticing a minor, and indecent exposure. *See* Iowa Code §§ 709.3(1)(*b*), 709.8(1)(*a*), 710.10(1), 709.9(1). Skahill pled not guilty. The court appointed a GAL on behalf of K.W. pursuant to Iowa Code section 915.37.

On May 24, Van Cura of the CPC interviewed K.W. again at the request of the prosecutor. A police officer observed this interview, and K.W. was informed the officer was listening in another room. During this interview, K.W. initially referred vaguely to one or more additional times when her dad had touched her, but she faltered when asked for details. K.W. also expressed concern that her dad would go to jail. K.W.'s account of the mid-February abuse remained essentially the same.

On February 17, 2019, prior to Skahill's trial, the district court ruled that both of K.W.'s CPC interview videos would be admitted into evidence under the residual exception to the hearsay rule. *See* Iowa R. Evid. 5.807. It reasoned that

the videos would be probative evidence regarding whether the alleged acts had occurred and that justice would be served by allowing "the jury to analyze . . . K.W.'s statements, demeanor and evaluate her credibility."

Skahill's first trial, which began on February 19, resulted in a mistrial. The district court carried over its evidentiary rulings to the second trial.

Skahill's second trial began on March 12. K.W. testified by videoconference from a separate room in the courthouse. *See* Iowa Code § 915.38(1)(*a*) (allowing this procedure to protect a minor from trauma). Additional prosecution witnesses included K.W.'s mother, Dr. Butteris, the emergency room nurse, and Van Cura. In addition, over Skahill's objection, videos of both CPC interviews were played for the jury.

Skahill took the stand in his own defense and denied that any touching had occurred, but he was impeached by certain prior inconsistent statements he had given the police. For example, at trial, Skahill claimed K.W. had never seen his penis. Previously, though, he told the police that K.W. had walked in when he was in the shower and also may have seen him engage in sexual activities with his wife. To explain this inconsistency, Skahill asserted at trial that his memory had improved because he "actually can think back and clarify." Skahill also acknowledged that he had punished K.W. by giving her "pops" on the hand and mouth, something that K.W. recounted in the first CPC recorded interview but did not mention in her trial testimony.

During closing argument, the prosecutor replayed approximately a dozen excerpts from the first recorded CPC interview. As the prosecutor put it, "[W]e have the CPC interview, and I want to play some parts to you to explain."

The jury found Skahill guilty on all counts. The district court merged the lascivious acts conviction into the sexual abuse conviction and, on June 3, imposed sentence. Skahill received concurrent sentences for a total of twenty-five years in prison. *See* Iowa Code § 902.9(1)(*b*) (providing a maximum of twenty-five years of confinement for a class "B" felony). Skahill filed a timely notice of appeal. We transferred Skahill's appeal to the court of appeals.

On appeal, Skahill raised two issues. First, Skahill argues that the CPC interview videos played for the jury were inadmissible hearsay and did not fall within any exception to the hearsay rule. In his view, admitting the videos was prejudicial and he should be given a new trial.

Skahill's second appellate issue concerns the GAL. Skahill argues that the GAL's role in his criminal case exceeded what Iowa Code section 915.37 allows. The court of appeals summarized Skahill's contentions as follows:

> Skahill contends the guardian ad litem overstepped her statutory authority by (1) opposing a defense motion to admit certain exhibits, which "had no bearing on the [child's] involvement in the trial"; (2) opposing a defense motion to exclude the videotaped forensic interviews of the child; (3) opposing the defense's request to have the child's step-sister testify; (4) resisting the defense request to recall the child for further questioning; (5) opposing the opinion testimony of the child's stepmother as to the child's truthfulness; (6) cross-examining the child's step-mother during a proffer outside the presence of the jury, notwithstanding the section 915.37 prohibition on "cross-examin[ing] witnesses"; (7) opposing defense counsels' motions to withdraw following the mistrial; (8) resisting a defense attorney's second motion to withdraw and for a continuance; and (9) resisting the defense motion for a new trial.

Skahill does not claim that his attorney objected in a timely manner to the GAL's actions; rather, he advances this part of his appeal under the rubric of ineffective assistance of counsel. Alternatively, in the event Iowa Code section 915.37 would allow this level of GAL involvement, Skahill argues that the statute violated his due process rights under the Fourteenth Amendment to the U.S. Constitution and article I, section 9 of the Iowa Constitution.

On November 4, 2020, the court of appeals rendered a decision affirming Skahill's convictions and sentence. The court agreed with the district court as to the admissibility of the first CPC video under the residual hearsay exception. It reasoned that the video was probative and necessary, finding that "[w]hile largely matching her trial testimony, the child's statements in the first forensic interview were slightly more detailed and contextualized." The court also observed that the video gave insight on the child's demeanor shortly after the events in question, which was a key point for the jury's consideration. In addition, the court of appeals found that admission of the first CPC video served the interests of justice, reasoning that "[t]he goal of 'truth-seeking' was served in the first forensic interview, which documented the child's virtually contemporaneous responses to open-ended questions about possible abuse."

The court of appeals viewed the second video differently. That video did not meet the necessity prong of the residual hearsay exception because it was done at the behest of law enforcement, it was not as contemporaneous, and K.W.'s narrative was "less clear." Yet the court of appeals also concluded any

error was harmless because the "evidence supporting the findings of guilt was overwhelming."

We granted Skahill's application for further review.

**III. Standard of Review.**

We review evidentiary rulings on hearsay for errors at law. *State v. Fontenot*, 958 N.W.2d 549, 555 (Iowa 2021); *see also State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020) ("Our review of the district court's ruling on a preliminary question of admissibility is for the correction of legal error."). We review for errors at law because "a district court 'has no discretion to admit hearsay in the absence of a provision providing for it.' " *Veverka*, 938 N.W.2d at 202 (quoting *State v. Dullard*, 668 N.W.2d 585, 589 (Iowa 2003)). Even so, we give deference to the factual findings of the district court when the findings are supported by substantial evidence. *Id.*

**IV. The Hearsay Issue.**

The State argues that the videos of K.W.'s CPC interviews were covered by two different hearsay exceptions: the medical diagnosis exception (Iowa Rule of Evidence 5.803(4)) and the residual exception (Iowa Rule of Evidence 5.807).

**A. Medical Diagnosis Exception.**[1] The medical diagnosis exception allows for admission of a hearsay statement that "(A) [i]s made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) [d]escribes medical history,

---

[1]The district court did not rely on the medical diagnosis exception when admitting the CPC videos, nor did the State argue in the district court that the exception applied. Nevertheless, the State may assert it as a ground for affirmance on appeal. *See State v. Smith*, 876 N.W.2d 180, 184 (Iowa 2016) ("[W]e may affirm a ruling on the admission of evidence by using a different rationale than relied on by the district court.").

past or present symptoms or sensations, or the inception or general cause of symptoms or sensations." Iowa R. Evid. 5.803(4). We have established a two-part test to determine whether "a child-declarant's identification of an abuser during treatment with a healthcare professional would fall within [this] exception." *State v. Walker*, 935 N.W.2d 874, 879 (Iowa 2019). First, the child-declarant's "motive in making the statement must be consistent with the purposes of promoting treatment." *State v. Tracy*, 482 N.W.2d 675, 681 (Iowa 1992) (en banc) (quoting *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985)). Second, "the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Id.* (quoting *Renville*, 779 F.2d at 436).

At the outset, we note that under Iowa Rule of Evidence 5.803(4), a statement "for . . . medical diagnosis or treatment" is normally made to someone who is qualified to provide a diagnosis or treatment. Of course, a hearsay declarant can conceivably make a statement for the purpose of medical diagnosis to anyone, even a family member. *State v. Long*, 628 N.W.2d 440, 443 (Iowa 2001) (en banc) ("The notes to [Federal Rule of Evidence 803(4)] indicate that statements to hospital attendants, ambulance drivers, or even members of the family may be admissible provided they are made for purposes of diagnosis or treatment.") (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(4)[01], at 803–152 (1994)). The primary focus is on the declarant's motive for making the statement. *Id.* But the fact a statement is made to nonmedical personnel tends to indicate it was not made for the purpose of medical diagnosis.

For example, in *State v. Hildreth*, we determined whether statements made to a social worker fell under the medical diagnosis exception. 582 N.W.2d 167, 169 (Iowa 1998). We held that the statements fell under the medical diagnosis exception after we considered whether the social workers were "qualified by training and experience to provide that diagnosis and treatment." *Id.* In *Hildreth*, the social workers were specifically qualified to diagnose and treat emotional trauma because they had "extensive training and experience in the field of child sexual abuse." *Id.*

K.W.'s interviewer in this case, Van Cura, described herself as a supervisor of the CPC and a forensic interviewer. She has a master's degree in counseling and has attended a significant number of workshops, conferences, webinars, and training focused on forensic interviewing. Her experience includes twenty-seven years as a forensic interviewer and more than 5,000 interviews. Van Cura is eminently qualified as a forensic interviewer. But she did not testify that she was qualified to diagnose or treat the physical and emotional trauma resulting from sexual abuse.

When describing her role as a forensic interviewer, Van Cura testified, "I have specialized training in talking with children about matters that may be presented to the court." This statement suggests she primarily viewed her role as an investigator, not a medical professional or therapist. Also, she spent eleven years with a sheriff's office investigating sexual assaults prior to her current role as a forensic interviewer. Thus, her experience in investigation was extensive, not so her experience in medicine or therapy.

There are other indicators that K.W. was not seeking medical help during her CPC interviews with Van Cura. K.W. had already been examined by Dr. Butteris at the CPC before her first interview with Van Cura. Dr. Butteris had gathered K.W.'s history, including what prompted K.W. to visit her office. K.W. told Dr. Butteris that "her dad had been touching her private area with his hands." That information was relayed to the jury because it was the type of information the medical diagnosis exception is designed to allow into evidence.

Dr. Butteris's examination paints a contrast to the Van Cura interview that followed. Van Cura's questioning involved initially building a rapport with K.W. and then solely focused on fact-finding. Van Cura testified that the children she interviews are normally referred to the CPC by law enforcement or the Iowa Department of Human Services (DHS). After her interviews, and sometimes during them, she will meet with law enforcement, DHS, and the physician to discuss the interview. At those meetings, she typically "make[s] recommendations for the purpose of counseling and provide[s] an abuse assessment." The record in this case is unclear as to who initially referred K.W. to the CPC or what happened after the interview. Regardless, we do not think the possibility that Van Cura might have recommended counseling after the interview would be enough to overcome the other indicators that K.W. was not seeking a medical diagnosis.

These circumstances are unlike those in *State v. Walker*, where we found that a child's statements to a physician at the Child Protection Response Center were admissible. 935 N.W.2d at 881. There, the physician performed both an

interview and a medical exam. *Id.* at 876. "The evidence show[ed] E.W.'s mother took E.W. to see Dr. Harre for the purposes of treatment." *Id.* at 880. "There [was] no evidence the purpose of the visit was to create evidence or otherwise bolster the State's case." *Id.* By contrast, Van Cura wasn't a physician, a psychologist, or therapist; there was a separate physician who attended to K.W. at that time; and Van Cura's questioning was self-described as "forensic."

The unavailability of the medical diagnosis exception is even clearer with respect to the second CPC interview. The second interview was arranged by the prosecutor, and law enforcement was present. K.W. was informed that an officer would be listening to the interview. The facts here are much like those in *State v. Bentley*, in which we held a forensic interview of a child to be testimonial for purposes of a Confrontation Clause analysis. *See* 739 N.W.2d 296, 299 (Iowa 2007) (holding an interview of a child arranged by law enforcement and with law enforcement present was testimonial). While analysis of the medical diagnosis exception and of the Confrontation Clause are not the same, it is difficult to imagine how a statement could simultaneously be both testimonial and made for the purpose of obtaining a medical diagnosis.

For the foregoing reasons, we find that neither CPC interview was admissible under the medical diagnosis exception.

**B. Residual Exception.** The State also argues the CPC interviews were admissible under the residual exception. The district court relied on this exception when it admitted the videos. The residual exception to the hearsay rule provides,

[A] hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in rule 5.803 or 5.804 [if]:

(1) The statement has equivalent circumstantial guarantees of trustworthiness;

(2) It is offered as evidence of a material fact;

(3) It is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) Admitting it will best serve the purposes of these rules and the interests of justice.

Iowa R. Evid. 5.807(*a*).

The requirements of the residual exception can be summarized as "trustworthiness, materiality, necessity, service of the interests of justice, and notice." *State v. Rojas*, 524 N.W.2d 659, 662–63 (Iowa 1994). These are not factors to be weighed; all five requirements must be satisfied. *State v. Weaver*, 554 N.W.2d 240, 247 (Iowa 1996), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249, 254 (Iowa 1998). Skahill challenges the district court's determination that the necessity and interests-of-justice requirements were met.

1. *A Narrow Exception.* The residual exception was designed to allow the admission of hearsay evidence that has "circumstantial guarantees of trustworthiness equivalent to the listed exceptions" but does not fit neatly under another exception. 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.807:1, at 1143 (2018–2019 ed. 2018). Courts have often used the residual exception to admit the out-of-court statements of child sex abuse victims. *See, e.g.*, *Rojas*, 524 N.W.2d at 664; *United States v. Peneaux*, 432 F.3d 882, 893 (8th

Cir. 2005); *United States v. Harrison*, 296 F.3d 994, 1007 (10th Cir. 2002). Even so, we have been careful not to allow the residual exception to swallow the rule against hearsay.[2]

In *State v. Veverka*, we explained that the residual exception is narrow, even when dealing with a child sex abuse case:

> The residual exception to the hearsay rule should be used sparingly. The admissibility of evidence under the exception depends on the unique facts and circumstances of each case. There is no rule that allows for the automatic admission of certain categories or types of evidence under the residual exception, and nothing in *Rojas, Neitzel*, or this opinion should be read to allow for the categorical admission into evidence of forensic interviews of alleged child sex abuse victims.

938 N.W.2d at 204. The residual exception's five requirements are designed to limit the exception and protect the overarching rule against hearsay. With this in mind, we turn to Skahill's points of contention: the requirements of necessity and the interests of justice.

2. *Necessity.* For evidence to fall under Iowa's residual exception, its admission must be a necessity. *Rojas*, 524 N.W.2d at 662. Not every state's evidence rules contain a necessity limitation. *See, e.g.*, Wis. Stat. § 908.03(24) (2020) (allowing "[a] statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness"); *State v. Mercado*, 953 N.W.2d 337, 350 (Wis. 2021) (holding a

---

[2]Iowa has a statute that specifically addresses the admissibility of recorded interviews such as those K.W. gave at the CPC. *See* Iowa Code § 915.38(3). The statute allows "recorded statements of a child . . . describing sexual contact" to be admitted if they "substantially comport" with the residual exception. *Id., see also Rojas*, 524 N.W.2d at 663 (discussing the statute (then Iowa Code section 910A.14(3)). In the present case, the State does not rely on Iowa Code section 915.38(3), and we will not consider it.

video recording of a child-victim's out-of-court statement was trustworthy without considering whether it was more probative than other available evidence). But the Iowa rule does.

The word "necessity" here is not used in the absolute sense. The hearsay evidence only needs to be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," as the rule requires. Iowa R. Evid. 5.807(*a*)(3). The word "probative" means "[t]ending to prove or disprove." *Probative*, *Black's Law Dictionary* (11th ed. 2019). Importantly, in the residual exception context, the proffered hearsay evidence's probative value is not viewed in a vacuum. We must consider the probative value of K.W.'s recorded CPC interviews in relation to the other evidence available to the State, particularly K.W.'s live testimony. To sum up the necessity requirement as applied to this case, the question we must answer is: Do K.W.'s video interviews tend to prove what happened to K.W. better than her trial testimony in which she was subject to cross-examination? For the reasons that follow, we hold they do not, and the necessity requirement is not met.

The two Iowa cases most directly on point, *State v. Rojas*, 524 N.W.2d 659, and *State v. Neitzel*, 801 N.W.2d 612 (Iowa Ct. App. 2011), provide examples of when admission of a hearsay video interview was a necessity. First, in *Rojas*, we allowed the admission of a video interview under the residual exception when a ten-year-old girl recanted her prior accusations during her trial testimony. 524 N.W.2d at 663–64. We decided the necessity requirement was satisfied because "the [video] was the best direct evidence implicating Rojas as [the child's] abuser,

it was the most probative evidence linking Rojas to the crime." *Id.* at 663. We did not expound on why the video was the most probative evidence, but the reason is apparent: the direct testimony fell short because the victim had abjured her prior accusation. *See id.* at 662. Another child testified she had seen Rojas "on top of" the victim, but that alone did not establish the sexual abuse of which Rojas had been accused. *Id.* And it was far less probative than a statement describing the sexual abuse coming from the victim. *See id.* Consequently, the victim's statements in the video interview were a necessity. *See id.* at 663.

In a more recent case, our court of appeals held that a video interview was admissible under the residual exception when the complaining witness was ten years old and could no longer remember the abuse she had suffered when she was seven. *State v. Neitzel*, 801 N.W.2d at 617. On the necessity requirement, the court reasoned, "The admission of the evidence was necessary because [the victim] was of a young age when the abuse occurred and unable to testify to the abuse at trial years later, making the close-in-time video recitation from [the victim], the most probative evidence of the abuse that occurred." *Id.* at 623. If the video had not been admitted, the prosecution would have been unable to present direct evidence of the abuse from the victim. On the issue of necessity, the key commonality between *Rojas* and *Neitzel* was that the most probative evidence, the victim's account of the alleged sexual abuse, would not have been presented to the jury simply by having the victim testify.[3]

---

[3]Federal courts have similarly concluded that a child's hearsay statements can be the most probative evidence when the child cannot or will not testify. The United States Court of Appeals for the Fourth Circuit reviewed the district court's use of the residual exception to admit

Notably, the bulk of the analysis in *Rojas* and *Neitzel* centered on the trustworthiness requirement, not the necessity requirement. *See Rojas*, 524 N.W.2d at 663; *Neitzel*, 801 N.W.2d at 623.[4] The videos were trustworthy because experienced interviewers asked open-ended and nonleading questions, and the victims provided detailed accounts. *Rojas*, 524 N.W.2d at 663. The children's statements were consistent and had "a ring of veracity." *Id.* And video gave the jury an opportunity to observe the declarant's demeanor. *Id.*

Here, the State attributes similar qualities to K.W.'s video interviews in arguing their admission was a necessity. The State maintains that the first CPC interview was recorded when K.W.'s memory was freshest and provides greater detail than her trial testimony. Further, the State points out that both videos allowed the jury to assess K.W.'s credibility. Yet, trustworthiness should not be equated with necessity. There are five distinct requirements to the residual exception, each of which must be met separately. The necessity element requires the hearsay evidence to be superior to other available evidence, not just reliable.

We recently considered the admissibility of a CPC interview video in *State v. Fontenot*, 958 N.W.2d 549. In that case, the video was admitted even though

---

two out-of-court statements made by two different children in *United States v. DeLeon*, 678 F.3d 317, 327–29 (4th Cir. 2012). Applying the abuse of discretion standard, the court affirmed the district court because one of the children was deceased and the other had recanted, making the hearsay statements the most probative evidence. *Id.*; *accord United States v. W.B.*, 452 F.3d 1002, 1005–06 (8th Cir. 2006) ("[W]hen a child is unable or unwilling to testify in a courtroom setting, a child's out-of-court statements may be the most probative evidence on an issue.").

[4]Sometimes courts seem to overlook the necessity requirement and solely focus on trustworthiness. *See, e.g.*, *United States v. Thunder Horse*, 370 F.3d 745, 748 (8th Cir. 2004) (holding that use of the residual exception to admit a child's out-of-court statements did not abuse discretion but only considering whether there were circumstantial guarantees of trustworthiness, not the relative probative value).

the child-victim testified without reservation at trial. *Id.* at 553–54. The State sought to uphold the admission of the CPC video on two different grounds: the prior consistent statement exception and the residual exception. *Id.* at 553. We determined the CPC interview video was admissible as a prior consistent statement once defense counsel had attempted to impeach the child's credibility on cross-examination to show she had changed her story. *Id.* at 564. Therefore, we did not need to decide whether the video was admissible under the residual exception. However, the dissent in *Fontenot* discussed the residual exception issue. *See id.* at 571–72 (McDonald, J., dissenting). It urged that the residual exception's necessity requirement was not met:

> [T]here is no showing of necessity . . . . [The child] was a teenager at the time of trial . . . . [The child] was able to testify regarding the specific allegations of abuse in great detail . . . . [The child] did not recant her allegations of sexual abuse . . . . Where the witness can testify to the allegations of abuse there is "no basis for concluding that this evidence was necessary for the State's case."

*Id.* at 572 (citations omitted) (quoting *State v. Metz,* 636 N.W.2d 94, 100 (Iowa 2001)).[5]

---

[5]A North Carolina court has suggested that recorded statements should rarely be admissible under the residual exception when the child-declarant is available to testify. *In re B.W.,* 852 S.E.2d 428, 435 (N.C. Ct. App. 2020). The court explained,

> The availability of a witness to testify at trial is a crucial consideration under either residual hearsay exception. Although the availability of a witness is deemed immaterial for purposes of Rule 803(24), that factor enters into the analysis of admissibility under subsection (B) of that Rule which requires that the proffered statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." If the witness is available to testify at trial, the "necessity" of admitting his or her statements through the testimony of a "hearsay" witness very often is greatly diminished if not obviated altogether.

*Id.* at 434 (quoting *State v. Fearing,* 337 S.E.2d 551, 554 (N.C. 1985)).

In the case cited by the *Fontenot* dissent, *State v. Metz*, the defendant talked with a pawnshop employee after the murder and stated, "I did it, I killed somebody" and "I really did it this time, I slipped." *Metz*, 636 N.W.2d at 100. The pawnshop employee died before trial but not before recounting the defendant's statement to law enforcement. *Id.* The prosecution sought to admit this hearsay statement through the testimony of a detective under the residual exception. *Id.* We held the evidence did not meet the necessity requirement because it was duplicative of other evidence the State had available to it. *Id.* The State could have called other witnesses who actually heard the defendant's statements and were available to testify; therefore, the hearsay statement was not the most probative evidence available. *Id.* While the present case differs in many respects, the underlying principle of our decision is the same: when the same evidence is available through in-court testimony, hearsay statements are generally not necessary under the residual exception. *See id.*

A federal court in Virginia recently struck a similar chord in *Nowlan v. Nowlan*, ___ F.Supp.3d ___, ___, 2021 WL 2379815, at *37 (W.D. Va. June 10, 2021). In *Nowlan*, the court declined to admit a child's forensic interview video even without the child testifying because the video was not more probative than other admissible hearsay statements the child made to a therapist. *See id; see also United States v. Zapata*, 356 F. Supp.2d 323, 328 (S.D.N.Y. 2005) (reasoning that the defendant had "subpoenaed the declarant . . . to appear as a witness in her case" and that "[the declarant's] testimony at trial under oath certainly would be more probative as to her alleged role in the conspiracy than a statement that

he made years ago"); *United States v. Wiley*, 36 M.J. 825, 829–31 (A.C.M.R. 1993) (holding that the military courts' version of the residual exception required necessity and that requirement was not met when a witness was available to testify to the content of the hearsay statement); *Nixon v. State*, 780 A.2d 344, 354 (Md. Ct. Spec. App. 2001) ("[The declarant's] live trial testimony, subject to cross-examination, was the most probative evidence."); *In re B.W.*, 852 S.E.2d 428, 435 (N.C. Ct. App. 2020) (reversing the admission of video recordings of children claiming sexual abuse where the "best evidence [would have come] from the children themselves" testifying at trial).

Several federal appellate decisions have upheld the admission of out-of-court statements by child complaining witnesses who also testified at trial. Typically, though, the trial testimony had a significant gap or weakness. For instance, the United States Court of Appeals for the Eighth Circuit has upheld the use of the residual exception when the child's trial testimony was inconsistent and hesitant. *See Peneaux*, 432 F.3d at 893. In *United States v. Peneaux*, the child was three years old when abused and was around age five when she testified. *Id.* at 887. At one point, "[the victim] was . . . asked how she received the burn mark on her stomach," and "she responded that [the defendant] had inflicted it with a lit cigarette, but she denied he had ever burned her when questioned by defense counsel." *Id.* at 888. The child's testimony on the sexual abuse allegation was similarly befuddling. *See id.* Because of this, the court held that hearsay statements the child made to adults were admissible under the residual exception because "the statements were . . . more probative

than [the child's] hesitant trial testimony." *Id.* at 893; *see also United States v. Gallardo*, 970 F.3d 1042, 1046 (8th Cir. 2020) (stating that the necessity issue was a "close call because [the child] testified to some details of the sexual contact but was also unresponsive to many questions"); *United States v. Gabe*, 237 F.3d 954, 957 n.2 (8th Cir. 2001) (noting that the teenage victim's "cumulative hearsay statement" to a doctor did not satisfy the necessity requirement of the residual exception).

Additionally, the Sixth Circuit upheld the admission of a child-victim's hearsay statements when the child testified at trial to abuse but was unable to provide important details in their trial testimony. *See United States v. Wandahsega*, 924 F.3d 868, 882 (6th Cir. 2019). This "very young" boy testified at trial that the defendant sexually abused him, but the "only detail that [the child] was able to provide about the alleged abuse was that [the defendant] had touched his privates more than one time." *Id.* at 881–82. Of particular importance, the child could not remember when the abuse occurred during his in-court testimony. *Id.* at 882. To fill in this detail, the court allowed hearsay evidence under the residual exception that was "highly probative" on the issue of timing. *Id.*

The Tenth Circuit rendered a similar decision in *United States v. Harrison*, 296 F.3d at 1007. In that case, the child-victim made three separate statements to different individuals detailing the sexual abuse she suffered, but she recanted her allegations at trial. *Id.* at 999. Two of the statements were admissible under traditional exceptions to the hearsay rule. *Id.* at 1001. The third statement was

made to law enforcement and provided additional details not present in the other two statements. *Id.* at 1007. It did not fit under a listed exception, but the court allowed its admission under the residual exception, stating that "the district court could properly rule that [the child's] statement to [law enforcement] was the most probative available evidence with respect to the details not disclosed in her other statements." *Id.* The court said "this is not an easy case" and ultimately held that the district court did not abuse its discretion. *Id.* As in *Wandahsega,* the residual exception was used to admit a hearsay statement that was more probative because of certain details missing from other available evidence.

While these courts have allowed the residual exception to be used in child sex abuse cases to fill in important details that are missing from a child's in-court testimony, we do not believe their reasoning is applicable here. When K.W. testified, she was responsive and forthcoming, and it was evident that she remembered what happened. While her trial testimony may not have been quite as vivid as her first CPC interview, it was not hesitant or contradictory. She testified to all of the critical points of the State's case—that Skahill showed her his "private," asked her to "wiggle it," and touched her "privates" under her clothes in a way that was painful. K.W.'s CPC interviews were not *more* probative than the otherwise available live testimony under which K.W. could be (and was) cross-examined. Therefore, we find the CPC video interviews do not satisfy the

necessity requirement of Iowa Rule of Evidence 5.807(*a*)(3), and the residual exception does not apply.[6]

**C. Harmless Error.** The State argues as a fallback that admission of the recorded CPC interviews was harmless error. When hearsay evidence is wrongly admitted we presume it "is prejudicial to the nonoffering party unless otherwise established." *Fontenot*, 958 N.W.2d at 562. One way the State can overcome this presumption is through overwhelming evidence of the defendant's guilt. *State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006).

We are not convinced there was overwhelming evidence here. For the most part, this case was K.W.'s word against Skahill's. There was physical evidence described as "[s]hort linear mucosal wound inferior and to the left of the urethral opening." But Dr. Butteris testified that such a wound could be caused by many things. There were no other witnesses with firsthand knowledge of what happened. Of course, the victim's testimony alone can sustain a conviction. *State v. Donahue*, 957 N.W.2d 1, 11 (Iowa 2021). Corroborating evidence, physical or otherwise, is not required. *Id.* But without more than K.W.'s account, and despite our impression that Skahill's performance on the stand may have harmed his defense, we cannot say the case against him was overwhelming.

Another way the State may potentially overcome the presumption of harm is by showing that the wrongly admitted evidence was cumulative. *State v. Elliot*, 806 N.W.2d 660, 669 (Iowa 2011); *State v. Reynolds*, 746 N.W.2d 837, 844 (Iowa

---

[6]Because we conclude the videos failed to meet the necessity prong of rule 5.807(*a*) for admissibility, we do not need to reach the interests-of-justice prong.

2008). Yet we also held in *State v. Elliot* that erroneously admitted hearsay can be prejudicial even when it is cumulative. 806 N.W.2d at 670 ("Although courts frequently find the erroneous admission of hearsay evidence constitutes harmless error because it is merely cumulative, that does not mean that all erroneously admitted hearsay evidence is harmless merely because it is cumulative."). In *Elliott*, we concluded the improperly admitted hearsay, "although merely cumulative, was prejudicial to [the defendant's] substantive rights because it unfairly tipped the scales towards [the defendant's] guilt." *Id.* at 673. We cautioned about the situation that arises "when a witness's credibility is central to the case and the only real purpose for admitting the hearsay evidence is to bolster that witness's credibility." *Id.* at 670.

"When inadmissible hearsay evidence directly addresses a hotly contested central dispute of the parties, it is harder for us to find the evidence nonprejudicial." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 267 (Iowa 2019). We believe that hearsay can align with a witness's trial testimony, and thus fall short of being necessary for purposes of rule 5.807(*a*)(3), without its admission being harmless error.

This is where Skahill focuses his argument. He claims that even if the evidence was cumulative, it was still prejudicial because K.W.'s credibility was vitally important to the State's case, and the prosecution used the CPC interviews only to bolster her credibility.

K.W. told essentially the same story in the two CPC interviews as she later did during her trial testimony. In all three of K.W.'s accounts, she stated that

her father showed her his "private," asked her to "wiggle it," painfully touched her "privates" under her clothes, and told her to keep it a secret. She also described the circumstances the same way—she fell asleep on Skahill's lap while they were watching TV, and the abuse happened when she woke up. Moreover, three other contemporaneous statements of K.W. describing the abuse were admitted through three different witnesses: the ER nurse, the CPC doctor, and K.W.'s mother.

Yet, we are unable to say the CPC videos—or at least the video of the first interview on February 19, 2018—did not make a difference.[7] Forensic interviews can be different from and, sometimes, more powerful than trial testimony. The questioner can be—indeed, often should be—openly sympathetic to the child. The interviewer and the child may be able to develop a rapport. There is no requirement in a forensic interview to ask only legally relevant questions or to avoid repetition. The narrative may flow more naturally than in the bumpy give-and-take of a trial—the setting in which witnesses normally must provide their testimony.

Here, the forensic interview questioning was more open-ended and slower paced. This allowed K.W. to give longer, more detailed answers. It also provided additional background for the jury. As we have already noted, the video indicated that Skahill would "pop" K.W. on her hands and mouth as punishment. K.W.

---

[7]Arguably, the video of the second interview on May 24, 2018, was not even helpful to the prosecution. K.W. vaguely referred to other instances of abuse but then retreated when Van Cura asked for details. This opened up an area of inconsistency for the defense to exploit in closing argument. Our ruling rejecting the State's harmless error argument is thus predicated on the admission of the first video.

even said a "pop" on the hand caused her to bleed on one occasion when she was three years old. Skahill later acknowledged on the stand that he "popped" K.W. as punishment; K.W. had not mentioned that in her live testimony. Although Skahill's use of corporal punishment may not have been directly relevant to whether he had sexually abused K.W. in mid-February 2018, the prosecutor used it as an example of a lack of boundaries in the household. The combination of K.W.'s recorded statements about "popping" and Skahill's subsequent admissions on the stand may have further bolstered K.W.'s credibility.

"[I]n determining whether prejudice existed, we have to look at the case as tried . . . ." *Elliot*, 806 N.W.2d at 673. We know the State regarded the video of the first CPC interview as important to its case because that video featured prominently in the State's closing argument. The prosecutor replayed approximately a dozen excerpts and argued the significance of each to the jury. Indeed, about half of the initial closing argument was essentially a selective rebroadcast of the video with prosecutorial voiceover.

Near the beginning of deliberations, the jury asked for a trial transcript. The court responded that there was no transcript available and the jury would have to rely on their recollection. However, at the same time, the court also adopted the prosecutor's suggestion that the video of the first CPC interview be given to the jury.[8] Several hours later, the jury returned guilty verdicts.

---

[8]To be clear, the plan all along had been for the jury to receive the video. However, the parties had to make sure it was properly redacted first.

Although the video of K.W.'s first forensic interview was cumulative of her trial testimony concerning Skahill's sexually abusive conduct, and therefore did not meet the necessity prong of the residual hearsay exception, the interview bolstered K.W.'s trial testimony in critical ways. Given the nature of the interview, its full content, and the prosecution's emphasis on that interview, we are unable to conclude that its admission was harmless error. Therefore, we must reverse Skahill's convictions and remand for a new trial.

**V. The Guardian Ad Litem Issue.**

K.W. was appointed a GAL pursuant to Iowa Code section 915.37.[9] On appeal, Skahill argues that the GAL's role in his criminal case exceeded what section 915.37 allows and that his counsel was ineffective for not objecting to that conduct. Because we reverse Skahill's conviction on other grounds, we need not decide his ineffective assistance of counsel claim. However, we will take this opportunity to provide guidance on the subject of the GAL's involvement. The issue has been fully briefed by both parties and is likely to come up again on retrial.

Iowa Code section 915.37 provides that a child is entitled to a GAL if the child is a witness for the prosecution in criminal cases involving certain kinds of abuse:

> A prosecuting witness who is a child . . . is entitled to have the witness's interests represented by a guardian ad litem at all stages of the proceedings arising from such violation. The guardian ad litem shall be a practicing attorney . . . . The guardian ad litem shall

---

[9]K.W. was a witness in a criminal case. Other code sections address the role of the GAL in other contexts. *See, e.g.*, Iowa Code §§ 232.2(22), 598.12. Our discussion here applies only to Iowa Code section 915.37.

receive notice of and may attend all depositions, hearings, and trial proceedings to support the child and advocate for the protection of the child but shall not be allowed to separately introduce evidence or to directly examine or cross-examine witnesses.

Iowa Code § 915.37(1). Thus, GALs may attend "depositions, hearings, and trial proceedings" in the service of two goals: "[1] support the child and [2] advocate for the protection of the child." *Id.* Additionally, the statute expressly disallows two specific activities: introducing evidence and examining witnesses. *Id.*

Prior to about 1970, there were few protections for child-victim witnesses in criminal cases. *See* David Libai, *The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System,* 15 Wayne L. Rev. 977, 978 (1969) ("[A] child victim for the most part remains neglected by the state.") In response to a growing concern over the plight of child victims, laws were passed across the nation to provide these children with protection.[10] *See* Ellen Forman, *To Keep the Balance True: The Case of* Coy v. Iowa, 40 Hastings L.J. 437, 440–45 (1989) (citing numerous laws that were passed during the 1970s and 1980s with the goal of better protecting child-victim witnesses).

The original version of Iowa Code section 915.37 was adopted during this time period in 1985. *See* 1985 Acts ch. 174, § 7 (originally codified at Iowa Code §§ 910A.3–.4 (1987)). The law was later reorganized and amended in 1998 as part of the Victim Rights Act. *See* 1998 Acts ch. 1090, § 30 (codified as amended at Iowa Code § 915.37 (1999)). Like the other laws passed around that time,

---

[10]The United States Supreme Court also took greater note of the problem around this time. *See Maryland v. Craig*, 497 U.S. 836, 852 (1990) ("[A] State's interest in 'the protection of minor victims of sex crimes from further trauma and embarrassment' is a 'compelling' one.") (quoting *Globe Newspaper Co. v. Super. Ct. of Norfolk Cnty.*, 457 U.W. 596, 607 (1982)).

section 915.37 was enacted in response to the increasingly recognized problem of child victims of sexual abuse continuing to be traumatized during the criminal proceeding against their abuser. The appointment of a GAL, as provided for by section 915.37, is meant to address that concern.

Skahill argues that the GAL's participation in this case went beyond what Iowa Code section 915.37 permits. He contends that the GAL advocated for Skahill's conviction instead of advocating for K.W.'s protection. On our review of the record in this case, we conclude that the GAL not only zealously and appropriately looked out for K.W.'s well-being but also took on the role of a second prosecutor at times. For example, on several occasions the GAL echoed the prosecutor's objections to the admission of certain defense evidence.

The State justifies this conduct by arguing that we should interpret section 915.37(1) "to allow a GAL to do anything to increase the chances of conviction" that is not expressly prohibited by section 915.37(1) or some other statute. In essence, the State equates "advocate[ing] for the protection of the child" with advocating for a conviction of the defendant. Iowa Code § 915.37(1).

We decline the State's invitation to so interpret section 915.37(1). The State overlooks the language in the statute defining the GAL's role as that of supporting the child and advocating for the protection of the child. Thus, we believe the GAL's activities should be devoted to supporting and protecting the child *within* the criminal case. It is not the GAL's role to attempt to bring about *a result* in the criminal case just because the GAL believes that result will benefit the child. The prosecution already advocates for a conviction. There is no need

for the GAL to become a sidekick. Instead, the GAL should voice concerns for the child that judges and parties are prone to overlook during the heat of a criminal proceeding.

Similar concerns motivated the Utah Supreme Court when it found that a trial court committed plain error in allowing a GAL "to act as co-prosecutor" in a criminal case. *State v. Harrison*, 24 P.3d 936, 945–47 (Utah 2001). The court observed that "[t]he role of the guardian ad litem is not to act as an advocate either for the State's position or for the defendant's position in a criminal trial." *Id.* at 945. "[T]he role of an attorney guardian ad litem in the litigation process is . . . limited because of the nature of the duties and responsibilities set forth by [the Utah] statutes." *Id.* at 946.

> As one early commentator has observed,
>
> [I]t is inevitable that any involvement of a guardian ad litem in criminal proceedings will have some effect on the success of the prosecution and defense of the case. The important questions that must be faced when defining the duties of the guardian are whether the fairness of the trial will be undermined and whether undue interference with the prosecution will result, taking into account the possible benefit to the child.

Mark Hardin, *Guardians ad Litem for Child Victims in Criminal Proceedings*, 25 J. Fam. L. 687, 702 (1987) [hereinafter Hardin].

Here, the GAL argued against the admission of certain evidence, such as photographs of the Skahills' chair, and opinion testimony regarding K.W.'s truthfulness. These arguments were inappropriate. Generally, a GAL should not be involved in evidentiary disputes that do not involve the child's own testimony. Advocating for a child's protection does not include arguing against the

admission of evidence solely because it advances the defendant's case or cuts against the child's testimony. Likewise, we do not think it is the GAL's job to argue for the admission of forensic interviews as a way of bolstering the child's credibility. *See* Hardin, 25 J. Fam. L. at 702 ("[I]nvolving the guardian ad litem in strengthening the child's testimony unduly entangles the guardian in the prosecution of the case.").

On the other side of the ledger, we think Skahill goes too far in asserting that GALs should never make legal arguments. The text of Iowa Code section 915.37 does not specifically disallow legal argument, and understandably so. It would be strange to require GALs to be attorneys and then disallow one of the defining characteristics of an attorney: the ability to make legal arguments. GALs may make legal arguments as long as they fall under the umbrella of advocating for the child's protection.

This case provides some examples of helpful involvement by a GAL. After Skahill's first trial ended in a mistrial, both his attorneys moved to withdraw. This motion went unopposed by the State. However, the GAL recognized that a withdrawal would delay the second trial and further draw out the emotional harm K.W. was suffering as a result. The GAL opposed the motion and the court denied one of the withdrawal requests, citing the GAL's advocacy as "the most powerful reason" for its decision.

Another contested point is whether GALs may ask questions of witnesses when the jury has been excused. In this case, the GAL cross-examined K.W.'s stepmother while she was being voir dired to determine whether she could offer

opinion testimony on K.W.'s truthfulness. Skahill argues that this questioning violated the express prohibition on "directly examin[ing] or cross-examin[ing] witnesses." Iowa Code § 915.37. The State contends that the questioning was permissible because the jury was not present. We agree with the defendant on this point. Nothing in section 915.37 distinguishes foundational, voir dire questioning from questioning with the jury present. We decline to read in a distinction that is not made in the text. The GAL cannot examine witnesses.

**V. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals, reverse the defendant's convictions and sentence, and remand for a new trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**